259 P.3d 158 (2011)
171 Wash.2d 881
STATE of Washington, Respondent,
v.
Lisa A. MULLEN, Petitioner.
State of Washington, Respondent,
v.
Kevin E. Dean, Petitioner.
Nos. 83981-6, 84283-3.
Supreme Court of Washington, En Banc.
Argued February 17, 2011.
Decided June 23, 2011.
*161 Craig Douglas Magnusson, Magnusson Law Office PS, Jennifer Lynn Castro, Attorney at Law, Bellevue, WA, Gregory Charles Link, Washington Appellate Project, Seattle, WA, for Petitioner.
Erik Pedersen, Attorney at Law, Skagit Co. Prosc. Atty. Office, Mount Vernon, WA, Skagit County Prosecuting Atty., Attorney at Law, Mount Vernon, WA, for Respondent.
J.M. JOHNSON, J.
¶ 1 Skagit County prosecuted both petitioners for stealing funds from their employer, Frontier Ford, a local car dealership. This case concerns the State's disclosure obligations to their defense under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
¶ 2 The prosecution retained Frontier Ford's accountant to investigate the crime and to testify at trial. At trial, the petitioners argued that Frontier Ford's owner authorized their personal use of dealership funds largely as a reward for assistance with the owner's dishonest financial dealings.
¶ 3 A jury convicted both petitioners. After their convictions, the petitioners obtained a previously sealed deposition of Frontier Ford's accountant taken in a separate civil suit between the owner of Frontier Ford and the accountant's firm. The deposition occurred before the conclusion of the criminal trial.
¶ 4 In a motion for a new trial, the petitioners argued that the accountant's deposition testimony supported the defense theory that the owner authorized use of the funds. The petitioners contended that the prosecution's *162 failure to disclose the information contained in the deposition and other documents pertaining to the civil suit constituted a due process violation under Brady. The trial court denied the motion, and the Court of Appeals affirmed.
¶ 5 We affirm the Court of Appeals and hold that no Brady violation occurred. We also hold that the trial court did not abuse its discretion by refusing to grant a new trial under CrR 7.5 on the asserted ground of newly discovered evidence.

Facts and Procedural History

1. The Facts of the Case

¶ 6 In 1992, Ron Rennebohm owned Frontier Ford and Lisa Mullen worked for him as office manager. Mullen's responsibilities included handling the dealership's bookkeeping. In 1996, Rennebohm hired Kevin Dean to work as Frontier Ford's general manager. That same year Dean and Mullen began a romantic relationship. Over the following years, Mullen embezzled funds from Frontier Ford, buying thousands of dollars worth of jewelry, expensive clothing, and other items unrelated to the automotive industry with company funds. When co-workers commented on Mullen's extravagant clothing, she credited her new lifestyle to profitably selling items at a popular on line auction web site (i.e., www.eBay.com). By 2001, Rennebohm's wife also noted Mullen's lavish lifestyle and suspected that Mullen was stealing from Frontier Ford.
¶ 7 In 2002, Rennebohm brought in Larry Stordahl to serve as his corporate general manager with authority over Frontier Ford. In June 2002, as a result of discussions with Stordahl, Rennebohm fired Dean. Hearing of the firing, Mullen told another Frontier Ford employee, "I may be next." Verbatim Report of Proceedings (VRP) (Jan. 9, 2006) at 125. Mullen confronted Rennebohm about firing Dean and was visibly upset.
¶ 8 During a review after Dean's departure, Rennebohm became aware of allegations of fraudulent bookkeeping practices at Frontier Ford. He contacted Rick Rekdal of the accounting firm Clothier & Head to analyze the company's financial records. Rekdal had served for several years as Rennebohm's personal accountant and as the accountant for Frontier Ford.
¶ 9 While waiting for Rekdal to arrive, Rennebohm had a conversation with Mullen. Mullen appeared nervous and asked if Rennebohm intended to fire her. Mullen called Rennebohm later that day, wanting to arrange a meeting. She confessed to Rennebohm that she had stolen from the dealership, stating that "it snowballed on her" and that if Rennebohm fired her "she could never pay" him back. VRP (Jan. 19, 2006) at 76. Mullen later made similar admissions to Rekdal, telling him that "she had lost her integrity" and that "she did not want to come back in to the dealership to face" her co-workers. VRP (Jan. 24, 2006) at 56.
¶ 10 Rennebohm reported his suspicions to the local police. Lacking in-house accounting expertise to investigate the alleged fraud, Skagit County authorities retained Rekdal's services to assist in their investigation. Rekdal ultimately concluded that Mullen and Dean took at least $1.2 million from Frontier Ford over a period of six years.

2. The Criminal Trial

¶ 11 There were three years of discovery and pretrial proceedings before the case went to a jury trial. The State jointly prosecuted Mullen and Dean in the Skagit County Superior Court. During the discovery period, defense counsel deposed Rennebohm and examined Rekdal, under oath, on multiple occasions. In addition to Mullen's admissions, including those referenced above, the prosecution presented several lines of evidence inculpating Mullen and Dean. The prosecution presented evidence to the jury that Rennebohm heavily relied on Mullen and Dean to run Frontier Ford. The jury heard evidence that Rennebohm could not fully interpret financial statements and was unable to personally confirm Mullen's handling of the company's financial records. The jury heard evidence that Mullen was the only person in the dealership with access to all of the databases on the company's computers; Rennebohm did not even have the computer password to access the company's financial records. Rennebohm expressly denied *163 that he authorized Mullen and Dean to spend company funds for their personal use. Other witnesses testified that Rennebohm was visibly upset upon discovering Mullen's fraudulent activity.
¶ 12 The prosecution also presented evidence that Mullen and Dean enjoyed an extravagant lifestyle between 1996 and 2002. Several merchants testified about selling expensive clothing, jewelry, and other nonbusiness related items to Mullen. Many of the purchases involved travel from Skagit County to Palm Springs, California. These purchases were not commensurate with Mullen's salary at the dealership. The jury heard evidence from Mrs. Rennebohm and Frontier Ford employees regarding Mullen's expensive wardrobe and jewelry. Additionally, the jury viewed numerous exhibits demonstrating extensive travel and other nonbusiness purchases made with company funds that benefited both Dean and Mullen.
¶ 13 The prosecution provided the jury with an extensive presentation of evidence, mostly through Rekdal, regarding the accounting practices at Frontier Ford. Rekdal testified that Mullen used a complex system of draws and balance transfers to divert company funds to the personal use of both petitioners. Rekdal testified that Mullen and Dean ultimately spent $1.2 million of Frontier Ford's money for nonbusiness purposes.
¶ 14 Mullen's defense largely conceded the prosecution's evidence but argued that Rennebohm authorized the nonbusiness use of Frontier Ford funds. The defense supported its theory in two ways. First, the defense attacked Rennebohm's credibility. The defense presented evidence that Rennebohm understood financial documents and accounting practices in the automotive sales industry and at Frontier Ford. The defense also presented evidence that Rennebohm shielded assets from a former business partner and his ex-wife. The defense cross-examined Rennebohm regarding his dealings with his ex-wife and his former business partner.
¶ 15 Second, the defense presented Mullen's own testimony to the jury. Mullen testified that she assisted Rennebohm in "cooking the books." VRP (Feb. 1, 2006) at 21. According to Mullen, though she felt initial reservations about aiding Rennebohm's dishonest activity, she claimed that a lawyer advised her that she had nothing to fear so long as Rennebohm authorized her activities. Mullen's testimony claimed that her assistance in hiding profits from Rennebohm's ex-wife, the government, his former business partner, and his employees made "millions" for Rennebohm. VRP (Id.) at 24. She testified that Rennebohm authorized her use of company funds on jewelry and other personal items as a reward for her excellent work, as gifts for other people, and because he wanted his employees to present a nice image. She testified that Rennebohm authorized the nonbusiness use of the money for Dean because Dean was a uniquely talented manager.
¶ 16 Mullen specifically testified regarding Payment Insured Plan Inc. (PIPI) income. PIPI plans are warranty plans that Frontier Ford offered to its customers. National Warranty Corporation (NWC) insured the plans. Frontier Ford, along with Rennebohm's other car dealerships, sold the PIPI plans and, based upon the sale of the plans, received refunds from NWC. Mullen testified that Rennebohm directed her to credit these refunds to his personal account rather than to Frontier Ford. According to Mullen, this scheme allowed Rennebohm to hide assets from his business partner and from employees and to avoid taxes on the money. The defense chose not to cross-examine Rennebohm or Rekdal regarding PIPI income and instead relied solely on Mullen's testimony.
¶ 17 Though Dean did not testify, his attorney argued that the government failed to prove that he knew of Mullen's acts or to prove that he benefited from her acts.
¶ 18 On February 7, 2006, the jury convicted both petitioners of first degree theft and conspiracy to commit first degree theft. The jury convicted Mullen of the additional offense of criminal profiteering.[1]

*164 3. Rekdal's Deposition in the Civil Suit

¶ 19 Before the criminal trial in July 2004, Rekdal and his accounting firm, Clothier & Head, stopped representing Rennebohm and his car dealerships as clients. Six months later, Rennebohm brought a civil suit in the King County Superior Court against Clothier & Head, alleging that the firm committed malpractice by failing to discover Mullen and Dean's embezzlement sooner. In light of the civil suit, Rekdal began to limit his contact with the prosecution out of concern that he needed to coordinate the conversations through his defense counsel in the civil suit. The King County Superior Court issued protective orders covering much of the discovery. The defense was aware of the pending malpractice lawsuit.
¶ 20 After his testimony at the criminal trial, but before the trial's completion, Rekdal testified at a deposition in the civil suit between Rennebohm and Clothier & Head. Rekdal gave testimony during his deposition regarding Mullen and Dean's embezzlement. On the first day of the deposition, Rekdal testified that he believed "funds left Frontier Ford unauthorized for non-Frontier Ford activity." Clerk's Papers (CP) at 6468. He also believed that Mullen and Dean's embezzlement was "unlawful." CP at 6470.
¶ 21 However, during the second day of the deposition, Rekdal's testimony was more ambivalent. He testified that he relied on Rennebohm's representations to conclude that Mullen and Dean lacked authorization to spend company funds. When asked if he had since come to a different opinion, Rekdal responded, "I don't know if I have an opinion one way or another on it." CP at 6564. When asked if he had a different belief than when he testified during the criminal trial, Rekdal responded, "I don't know what to believe any more." Id. Rennebohm's attorney in the civil suit further pressed Rekdal on whether he had changed his belief that Rennebohm did not authorize the transactions of Mullen and Dean. CP at 6565. Rekdal responded, "Not necessarily[.] ... Based on the information I have, that was my belief at the time and is probably my belief today. Best I can answer that question." Id.[2]
¶ 22 Rekdal's deposition included allegations that he caught Rennebohm in "several misstatements." CP at 6567. When asked for a specific example, Rekdal said, "I asked him if he had ever authorized medical insurance for Lisa Mullen, he said no. Later found documents in the employee's file that he had signed that said he did." Id.[3]
¶ 23 The other example of Rennebohm's "misstatements" identified by Rekdal was his "representations to me regarding PIPI income." CP at 6568. Rekdal testified that he obtained schedules of the PIPI loans made to Rennebohm and Frontier Ford that identified individual and corporate loans that he was unaware of. Rekdal became concerned that Frontier Ford's tax returns understated the company's income. Subsequently, Rekdal sent a letter to Rennebohm terminating his firm's representation and recommending that Rennebohm amend his income tax returns.

4. The Motion for a New Trial

¶ 24 In May 2006, a confidential settlement resolved the civil suit. After obtaining a copy of Rekdal's deposition and the record in the civil suit, the petitioners moved for a new trial. The defense argued that Rekdal's deposition, along with other documents in the record, warranted a new trial under CrR 7.5 and Brady. In addition to Rekdal's deposition testimony, the petitioners relied on evidence related to PIPI income, medical insurance, and Clothier & Head billing records.
¶ 25 The trial court denied the motion, and the petitioners appealed. In a letter opinion, Judge John M. Meyer set forth his reasons for denying the motion. Judge Meyer noted that he allowed broad impeachment of Rennebohm at trial, that the petitioners knew of Rennebohm's suit against Clothier & Head, *165 and that "[a]ll of the assumptions that the defense now wants drawn in a new trial could have easily been drawn in the case tried earlier this year." CP at 7183.
¶ 26 In an unpublished opinion, the Court of Appeals affirmed the convictions of both Mullen and Dean. State v. Mullen, noted at 152 Wash.App. 1048, 2009 WL 3418537 (2009). Mullen filed a petition for review, which was granted. State v. Mullen, 168 Wash.2d 1035, 230 P.3d 1062 (2010). Dean filed a petition for review, which was granted in part, limited to the issue of whether a Brady violation occurred. State v. Dean, 169 Wash.2d 1010, 236 P.3d 206 (2010). These two cases were consolidated.

Analysis
¶ 27 We affirm the Court of Appeals. We hold that the nondisclosure of the information contained in Rekdal's deposition, along with other documents in the record of the civil suit, did not constitute a Brady violation and that the trial court did not abuse its discretion by not granting a motion for a new trial.

1. The Brady Claim

¶ 28 A violation of the rule promulgated in Brady and its progeny is a violation of constitutional due process. See Brady, 373 U.S. at 87, 83 S.Ct. 1194. We review alleged due process violations de novo. State v. Cantu, 156 Wash.2d 819, 831, 132 P.3d 725 (2006). Thus, we review claims under Brady de novo.
¶ 29 In Brady, the United States Supreme Court articulated the government's disclosure obligations in a criminal prosecution: "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87, 83 S.Ct. 1194. In subsequent years, the Supreme Court expanded the Brady rule's reach. Favorable evidence under Brady now includes not only exculpatory evidence but also impeachment evidence. Giglio v. United States, 405 U.S. 150, 154-55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Brady obligations extend not only to evidence requested by the defense but also to favorable evidence not specifically requested by the defense. United States v. Agurs, 427 U.S. 97, 110, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The government must disclose not only the evidence possessed by prosecutors but evidence possessed by law enforcement as well. Kyles v. Whitley, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).
¶ 30 In the years following Brady, the Supreme Court also grappled with the proper test for measuring whether evidence is "material" to guilt or punishment. Writing for only three justices, Justice Blackmun determined that "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (opinion of Blackmun, J.). Justice Blackmun distinguished the "reasonable probability" standard as an intermediate test. It is a more favorable standard for the government than harmless error analysis. Id. at 680, 105 S.Ct. 3375. However, it does not require a defendant to demonstrate that "the evidence if disclosed probably would have resulted in acquittal." Id. The majority of the Supreme Court subsequently adopted Justice Blackmun's test. Kyles, 514 U.S. at 433-34, 115 S.Ct. 1555.
¶ 31 Under the Supreme Court's current jurisprudence, to establish a Brady violation, a defendant must demonstrate the existence of each of three necessary elements: "[ (1) ] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [(2) ] that evidence must have been suppressed by the State, either willfully or inadvertently; and [(3)] prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). As we conduct our analysis under Brady, we consider not only its discrete elements but its animating purpose as well. "The animating purpose of Brady is to preserve *166 the fairness of criminal trials." Morris v. Ylst, 447 F.3d 735, 742 (9th Cir.2006) (citing Brady, 373 U.S. at 87, 83 S.Ct. 1194). "The Brady rule is not meant to `displace the adversary system'; `the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused, that, if suppressed, would deprive the defendant of a fair trial.'" Id. (quoting Bagley, 473 U.S. at 675, 105 S.Ct. 3375).
¶ 32 The second element of an alleged Brady violation requires proof that the State suppressed evidence favorable to the defense. Brady obligations include not only evidence in the prosecutor's file but also include evidence in the possession of the police and others working on the State's behalf. State v. Lord, 161 Wash.2d 276, 292, 165 P.3d 1251 (2007) (citing Kyles, 514 U.S. at 438, 115 S.Ct. 1555). However, "[t]he prosecution is under no obligation to turn over materials not under its control." United States v. Aichele, 941 F.2d 761, 764 (9th Cir.1991). "While the prosecution must disclose any information within the possession or control of law enforcement personnel, it has no duty to volunteer information that it does not possess or of which it is unaware." United States v. Hsieh Hui Mei Chen, 754 F.2d 817, 824 (9th Cir.1985) (citation omitted); see also United States v. Shryock, 342 F.3d 948, 983-84 (9th Cir.2003) (holding that federal prosecutors did not violate Brady by not disclosing records in possession of a state agency); Aichele, 941 F.2d at 764 (same).
¶ 33 Further, where "a defendant has enough information to be able to ascertain the supposed Brady material on his own, there is no suppression by the government." Aichele, 941 F.2d at 764.[4] "`[W]here the defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence, the Government does not commit a Brady violation by not bringing the evidence to the attention of the defense.'" Raley v. Ylst, 470 F.3d 792, 804 (9th Cir. 2006) (quoting United States v. Brown, 582 F.2d 197, 200 (2d Cir.1978)). "`[T]here is no authority for the proposition that the government's Brady obligations require it to point the defense to specific documents with[in] a larger mass of material that it has already turned over.'" Rhoades v. Henry, 638 F.3d 1027, 1039 n. 12 (9th Cir.2011) (alteration in original) (quoting United States v. Mulderig, 120 F.3d 534, 541 (5th Cir.1997) (internal quotation omitted)). "Since suppression by the Government is a necessary element of a Brady claim, if the means of obtaining the exculpatory evidence has been provided to the defense, the Brady claim fails." United States v. Dupuy, 760 F.2d 1492, 1501 n. 5 (9th Cir.1985) (citation omitted).
¶ 34 Our recent precedents expositing the Brady doctrine affirm this proposition: "[e]vidence that could have been discovered but for lack of due diligence is not a Brady violation." Lord, 161 Wash.2d at 293, 165 P.3d 1251; see also State v. Gregory, 158 Wash.2d 759, 798, 147 P.3d 1201 (2006); State v. Thomas, 150 Wash.2d 821, 851, 83 P.3d 970 (2004); In re Pers. Restraint of Gentry, 137 Wash.2d 378, 396, 972 P.2d 1250 (1999); In re Pers. Restraint of Benn, 134 Wash.2d 868, 916, 952 P.2d 116 (1998).[5]
*167 ¶ 35 With respect the third element of a claim under Brady, "`[t]he terms "material" and "prejudicial" are used interchangeably....'" United States v. Price, 566 F.3d 900, 911 n. 12 (9th Cir.2009) (quoting Benn v. Lambert, 283 F.3d 1040, 1053 n. 9 (9th Cir.2002)). Evidence is "prejudicial" or "material" "`if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Kyles, 514 U.S. at 433-34, 115 S.Ct. 1555 (quoting Bagley, 473 U.S. at 682, 105 S.Ct. 3375 (opinion of Blackmun, J.)). A "reasonable probability" is shown if the suppression of the nondisclosed evidence "`undermines confidence in the outcome of the trial.'" Id. at 434, 115 S.Ct. 1555 (quoting Bagley, 473 U.S. at 678, 105 S.Ct. 3375). For purposes of the Brady materiality test, we consider evidence "collectively, not item by item." Id. at 436, 115 S.Ct. 1555.
¶ 36 An important aspect of materiality under Brady is admissibility. "`Wrapped up in this standard of materiality are issues of admissibility; if evidence is neither admissible nor likely to lead to admissible evidence[,] it is unlikely that disclosure of the evidence could affect the outcome of a proceeding.'" Gregory, 158 Wash.2d at 797, 147 P.3d 1201 (alteration in original) (quoting State v. Knutson, 121 Wash.2d 766, 773, 854 P.2d 617 (1993)); see also United States v. Kennedy, 890 F.2d 1056, 1059 (9th Cir.1989) ("To be material under Brady, nondisclosed information or evidence acquired through that information must be admissible."); Wood v. Bartholomew, 516 U.S. 1, 6, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995) (per curiam) (holding that nondisclosed polygraph examinations of two witnesses, inadmissible under state law, were not material under Brady) ("Disclosure of the polygraph results, then, could have had no direct effect on the outcome of the trial, because respondent could have made no mention of them either during argument or while questioning witnesses.").
¶ 37 The petitioners allege that the prosecution failed to disclose favorable evidence and that the nondisclosure prejudiced the accused. The petitioners specifically identify three types of nondisclosed evidence[6]: (1) Rekdal's doubts and opinions about Rennebohm recited in the civil deposition, (2) PIPI documents and Clothier & Head billing records, and (3) Mullen's health insurance authorization. For purposes of our analysis, we assume that all three types of evidence favor the petitioners. Nevertheless, nondisclosure of this evidence did not amount to a Brady violation.

a. Rekdal's Doubts and Opinions Recited in the Civil Deposition

¶ 38 The nondisclosure of Rekdal's doubts and opinions regarding Rennebohm does not constitute a Brady violation. The State did not suppress Rekdal's doubts and opinions. For purposes of Brady, there is no government suppression where the "`defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence[;] the Government does not commit a Brady violation by not bringing the evidence to the attention of the defense.'" Raley, 470 F.3d at 804 (quoting Brown, 582 F.2d at 200). By providing the defense pretrial opportunities to examine Rekdal, the State satisfied any Brady obligations with *168 respect to the contents of his testimony. Brady does not require the prosecutor to prepare notes for the defense or to highlight a particular line of questioning that is promising for the defense theory of the case.
¶ 39 "`[A]ny allegation of suppression boils down to an assessment of what the State knows at trial in comparison to the knowledge held by the defense.'" Dupuy, 760 F.2d at 1501 n. 5 (quoting Giles v. Maryland, 386 U.S. 66, 96, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967) (White, J., concurring)). Here, the State and the defense stood on equal footing. Both the State and the defense had the ability to question Rekdal before and during the criminal trial. There is no suppression by the State where the defense fails to ask questions that could elicit favorable responses.
¶ 40 A witness must testify truthfully. He is subject to his oath, the penalty of perjury, and the test of cross-examination. If a witness later recants or expresses misgivings regarding his trial testimony, the proper framework to analyze the significance of the witness' subsequent doubts is through a motion based on newly discovered evidencean analysis separate and distinct from the State's disclosure obligations under Brady.
¶ 41 Further, Rekdal's doubts and opinions are not material under Brady. Rekdal's later ambivalence regarding whether or not Rennebohm authorized the transactions of Mullen and Dean is not admissible evidence. First, the evidence is not exculpatory. The fact that Rekdal primarily relied on Rennebohm's assertions to conclude that Rennebohm did not authorize Mullen and Dean to convert company funds to their personal use does not negate their guilt.
¶ 42 Second, the defense could not have used the evidence to impeach Rekdal. Rekdal did not testify regarding authorization at the criminal trial. Rekdal testified that Frontier Ford accounts, within the control of Mullen and Dean, were involved in numerous transactions for nonbusiness purposes. Neither Mullen nor Dean denied this evidence. Rekdal did not testify with respect to whether Rennebohm authorized the transactions the primary defense relied on by the petitioners. Even if the defense possessed the deposition testimony of Rekdal, his testimony did not contradict his trial testimony. Impeachment by contradiction under ER 613 was not an available option.
¶ 43 Third, the defense could not have used Rekdal's deposition to impeach Rennebohm. ER 608(b) generally prohibits impeachment of a witness' credibility based on specific instances of conduct. The rule contains an exception for acts relating to truthfulness. However, even where the specific acts relate to truthfulness, ER 608(b) prohibits impeachment by extrinsic evidence. The defense could not have used Rekdal's deposition to impeach Rennebohm.[7]
¶ 44 Lastly, significant additional evidence supported the jury's finding of guilt. The defense attacked Rennebohm's credibility through Mullen's own testimony and a lengthy cross-examination of Rennebohm regarding allegedly dishonest financial dealings. Rennebohm's ex-wife even testified for the defense. The jury heard and ultimately discounted the defense's attacks on Rennebohm. The jury also heard evidence that Mullen admitted embezzling the funds on multiple occasions, that Rennebohm became visibly upset upon discovery of the theft, and that Rennebohm personally called the police asking them to investigate his company's financial records. Considering the totality of the evidence, there is not a reasonable probability that the jury would have believed the defense argument that Rennebohm authorized Mullen and Dean to spend $1.2 million for their personal use. The nondisclosure of Rekdal's doubts and opinions do not undermine our confidence in the outcome of the case, did not deprive petitioners of a fair trial, and did not violate Brady.

b. PIPI Income Documents and Clothier & Head Billing Records

¶ 45 The State did not suppress the PIPI income documents or the billing records *169 from the separate civil case. "The prosecution is under no obligation to turn over materials not under its control." Aichele, 941 F.2d at 764. The prosecution "has no duty to volunteer information that it does not possess or of which it is unaware." Chen, 754 F.2d at 824; see also Shryock, 342 F.3d at 983-84; Aichele, 941 F.2d at 764.
¶ 46 The petitioners' argument rests on two assumptions: (1) that any information possessed by accountants at Clothier & Head is imputed to Rekdal and (2) that any information possessed by Rekdal is imputed to the State. The petitioners then contend that the nondisclosure of PIPI income documents and billing records by Clothier & Head constitutes suppression by the State.
¶ 47 However, "[w]hile prosecutors may be held accountable for information known to police investigators, we are loath to extend the analogy from police investigators to cooperating private parties who have their own set of interests ... [which] are often far from identical toor even congruent with the government's interests." United States v. Josleyn, 206 F.3d 144, 154 (1st Cir.2000) (citation omitted). Though Brady obligations can extend to individuals beyond prosecutors and police (see Kyles, 514 U.S. at 438, 115 S.Ct. 1555; Lord, 161 Wash.2d at 292, 165 P.3d 1251), at some point the connection between the nondisclosure and the State becomes too remote for the underlying rationale of Brady to apply. Whether an individual constitutes a state actor for purposes of Brady remains open to a fact-specific analysis. See Avila v. Quarterman, 560 F.3d 299, 308 (5th Cir.2009) (adopting a case-by-case analysis for determining whether an expert witness is a state actor for Brady purposes); United States v. Stewart, 433 F.3d 273 297-99 (2d Cir.2006) (rejecting categorical approach for determining whether a person is a state actor for Brady purposes and adopting a fact-specific approach and stating that "the relevant inquiry is what the person did, not who the person is."); see also Josleyn, 206 F.3d at 152-54. Here, the connection between Clothier & Head is too distant and the firm's nondisclosures are not properly attributable to the State.
¶ 48 Clothier & Head ultimately obtained the documents at issue through a third party subpoena in the course of its civil suit. Where a third party possesses documents essential to the defense, the proper mechanism for the defense to obtain the information is through a subpoena. If a third party fails to honor the subpoena and later the defendant discovers exculpatory or pivotal impeachment evidence, the proper mechanism to challenge his criminal conviction is through a motion based on newly discovered evidence. Brady governs the State's disclosure obligations and does not provide the proper analytical framework to analyze any-and-all evidence discovered after trial. See Dist. Attorney's Office for Third Judicial Dist. v. Osborne, ___ U.S. ___, 129 S.Ct. 2308, 2320, 174 L.Ed.2d 38 (2009) (stating that Brady is the wrong framework for analyzing a defendant's right to postconviction DNA (deoxyribonucleic acid) testing)). The minimal guarantees of due process do not require the prosecution to conduct an independent investigation in the hopes of bolstering potentially exculpatory defense theories. The State must turn over favorable material evidence in its possession: no more and no less.[8]
¶ 49 Further, there is no Brady violation when a defendant possessed the information that he claims was withheld or where he possesses the "salient facts regarding the existence of the [evidence] that he claims [was] withheld." Raley, 470 F.3d at 804. Here, the defense knew of the PIPI income and discussed it during Mullen's direct testimony. Despite this knowledge, the defense opted not to cross-examine Rekdal or Rennebohm on the PIPI income issue. Likewise, neither party disputed that Clothier & Head provided accounting services for Rennebohm, Frontier Ford, and Rennebohm's other dealerships. That Clothier & Head billed for these services was equally uncontroverted. *170 The defense knew of the PIPI income documents and billing records but chose not to feature either of them prominently in its presentation to the jury. The State did not suppress Brady material by failing to retrieve additional documents.
¶ 50 If the nondisclosed information was available through the defense's own due diligence, there is no suppression under Brady. Aichele, 941 F.2d at 764 ("[Where] a defendant has enough information to be able to ascertain the supposed Brady material on his own, there is no suppression by the government."); Ellsworth, 333 F.3d at 6; DiSimone, 461 F.3d at 197; Pondexter, 537 F.3d at 526; Carvajal, 542 F.3d at 567; Ward, 592 F.3d at 1183.[9]
¶ 51 While the State cannot avoid its disclosure obligations under Brady by hiring third parties to conduct investigations, Brady does not obligate the State to obtain every potentially relevant document in the hands of a private party hired as an expert consultant. Brady did obligate the State to disclose the evidence relied on by Rekdal to produce the exhibits and testimony he presented at trial. However, documents obtained by Clothier & Head for purposes of a separate civil suit, fall outside the scope of the prosecutor's duty to diligently seek out evidence favorable to the accused. Further, the defense failed to exercise due diligence when it knew of the PIPI documents and chose not to subpoena NWC, the company from which Clothier & Head ultimately obtained the documents during the civil suit. The State did not improperly suppress the PIPI income documents or the billing records.
¶ 52 Additionally, the nondisclosure of PIPI income documents and billing records did not prejudice the accused because they are not material under Brady. The documents lacked impeachment value. Neither Rennebohm nor Rekdal testified about Clothier & Head's billing practices or PIPI income; hence, the petitioners could not have impeached either witness by contradiction under ER 613.[10]
¶ 53 Neither records indicating that PIPI directly reimbursed Rennebohm for loans from his car dealerships nor evidence that Clothier & Head extensively billed Rennebohm supports the defense theory that Mullen and Dean were authorized to spend company funds for personal use. The documents do not create a reasonable probability of a different outcome nor do they undermine our confidence in the verdict. Therefore, the documents were not material and no Brady violation occurred.

c. Mullen's Health Insurance Authorization

¶ 54 The nondisclosure of Mullen's health insurance authorization by Rekdal did not constitute a Brady violation. Rekdal obtained Mullen's health insurance authorization in the course of his investigation and improperly failed to disclose it to the defense. *171 This nondisclosure is properly attributable to the State.
¶ 55 However, Mullen's health insurance authorization was not material under Brady's third prong. At best, proof of the authorization might have inspired a line of cross-examination for Rennebohm regarding one potential falsehood (or maybe just erroneous memory) under ER 608(b). However, this alone is not enough to establish the reasonable probability of a different outcome from the jury trial or to undermine our confidence in the fundamental fairness and results of the proceedings. Mullen's health insurance authorization was not material under Brady and therefore no Brady violation occurred.[11]

2. The Trial Judge Was Within His Discretion in Denying the Motion for a New Trial

¶ 56 "Except where questions of law are involved, a trial judge is invested with broad discretion in granting motions for new trial. The exercise of that discretion will not be disturbed on appeal absent an abuse of discretion." State v. Williams, 96 Wash.2d 215, 221, 634 P.2d 868 (1981). Where questions of law are involved, we review them de novo. Pardee v. Jolly, 163 Wash.2d 558, 566, 182 P.3d 967 (2008).
¶ 57 Under CrR 7.5(a)(3), a trial court may grant a new trial on the ground of newly discovered evidence. A defendant seeking a new trial on that ground must prove that the new evidence: "(1) will probably change the result of the trial; (2) was discovered after the trial; (3) could not have been discovered before trial by the exercise of due diligence; (4) is material; and (5) is not merely cumulative or impeaching. A new trial may be denied if any one of these factors is absent." State v. Macon, 128 Wash.2d 784, 800, 911 P.2d 1004 (1996) (footnote omitted). The first prong of the analysis for newly discovered evidence requires the defendant to show that the new evidence "will probably change the result of the trial." Id. (emphasis added). However, the third prong of Brady only requires the defendant to show the less exacting standard of "reasonable probability," which does not require a defendant to demonstrate that "the evidence if disclosed probably would have resulted in acquittal." Bagley, 473 U.S. at 680, 105 S.Ct. 3375 (opinion of Blackmun, J.) (emphasis added); Kyles, 514 U.S. at 434, 115 S.Ct. 1555. Because Brady materiality is a lower standard, nondisclosed evidence that fails to satisfy the materiality prong under Brady can never justify reversal of a court's decision to deny a new trial on a motion based on newly discovered evidence. See Josleyn, 206 F.3d at 151-52. Here, because the nondisclosed evidence is not material under Brady, either individually or collectively, the trial court did not abuse its discretion by denying the motion for a new trial on the asserted ground of newly discovered evidence.

Conclusion
¶ 58 We affirm the Court of Appeals and hold that no Brady violation occurred. We also hold that the trial court did not abuse its discretion by not granting a new trial under CrR 7.5 on the asserted ground of newly discovered evidence.
WE CONCUR: BARBARA A., Chief Justice, CHARLES W. JOHNSON, GERRY L. ALEXANDER, TOM CHAMBERS, SUSAN OWENS, MARY E. FAIRHURST, DEBRA L. STEPHENS, and CHARLES K. WIGGINS, Justices.
NOTES
[1] The conviction for criminal profiteering stemmed from Mullen's sale of many items purchased with the stolen funds.
[2] Rekdal resolved his doubts concerning the guilt of Mullen and Dean when responding to the motion for new trial and stated unequivocally that they received payment "in excess of what they were entitled to." CP at 6901.
[3] Rekdal briefly testified at the trial about bookkeeping irregularities concerning medical insurance. VRP (Jan. 25, 2006) at 114-17.
[4] One panel questioned the holding in Aichele. See Benn v. Lambert, 283 F.3d 1040, 1061 (9th Cir.2002). However, the Ninth Circuit subsequently reaffirmed the rule in Aichele and expressly endorsed it as "binding circuit law." United States v. Bond, 552 F.3d 1092, 1096 (9th Cir.2009) ("[W]e are bound by this passage, at least in cases like Aichele where there was no government action to throw the defendant off the path of the alleged Brady information.").
[5] The Ninth Circuit disagreed with our decision in Benn and affirmed the federal district court's decision to grant the petitioner habeas relief based upon a Brady violation. Lambert, 283 F.3d at 1062. However, the decision in Lambert specifically dealt with situations in which the government misled the defense by giving it an incomplete summary of an investigator's report. See Bond, 552 F.3d at 1097 (distinguishing Lambert).

The majority of the federal circuits, including the Ninth Circuit, refuse to find a Brady violation where the defense can access the material through its own due diligence. See Ellsworth v. Warden, 333 F.3d 1, 6 (1st Cir.2003); DiSimone v. Phillips, 461 F.3d 181, 197 (2d Cir.2006); United States v. Pelullo, 399 F.3d 197, 213 (3d Cir.2005); United States v. Jeffers, 570 F.3d 557, 573 (4th Cir.2009); Pondexter v. Quarterman, 537 F.3d 511, 526 (5th Cir.2008); Owens v. Guida, 549 F.3d 399, 415 (6th Cir.2008); Carvajal v. Dominguez, 542 F.3d 561, 567 (7th Cir.2008); Mandacina v. United States, 328 F.3d 995, 1001-02 (8th Cir.2003); Aichele, 941 F.2d at 764; Ward v. Hall, 592 F.3d 1144, 1183 (11th Cir. 2010); Xydas v. United States, 445 F.2d 660, 668 (D.C.Cir.1971). It is unclear whether the 10th Circuit allows for a Brady violation where the defense could obtain the material through its own due diligence. Compare United States v. Quintanilla, 193 F.3d 1139, 1149 (10th Cir.1999) ("whether a defendant knew or should have known of the existence of exculpatory evidence is irrelevant to the prosecution's obligation to disclose the information"), with United States v. Erickson, 561 F.3d 1150, 1163 (10th Cir.2009) ("no Brady violation is possible when [the] defendant `knew or should have known the essential facts permitting him to take advantage of any exculpatory information'" (quoting Coe v. Bell, 161 F.3d 320, 344 (6th Cir. 1998))).
[6] The petitioners make broad generalized statements regarding nondisclosed documents and information, but only specifically identify three types of evidence in their petitions for review. See Mullen Pet. for Review at 15; Dean Pet. for Review at 7, 10. We focus our analysis on the evidence specifically identified by the petitioners and not generalized statements that lack identifiable support in the record.
[7] Likewise, neither Rekdal's trial testimony nor his deposition states an opinion regarding Rennebohm's character for truthfulness.
[8] This is not to discount an individual prosecutor's duty to learn of favorable evidence already in the State's possession. See Kyles, 514 U.S. at 437, 115 S.Ct. 1555. However, the prosecutor's duty to seek out favorable evidence already in the State's possession does not create an additional duty for the State as a whole to seek out evidence that is not already in its possession.
[9] See also United States v. Coplen, 565 F.3d 1094, 1097 (8th Cir.2009) ("`The government does not suppress evidence in violation of Brady by failing to disclose evidence to which the defendant had access through other channels.'" (quoting United States v. Zuazo, 243 F.3d 428, 431 (8th Cir. 2001))); Pelullo, 399 F.3d at 213 ("Our jurisprudence has made clear that Brady does not compel the government `to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself.'" (internal quotation omitted) (quoting United States v. Starusko, 729 F.2d 256, 262 (3d Cir. 1984))); Jeffers, 570 F.3d at 573 ("As we have explained, however, `where exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the Brady doctrine.'" (quoting United States v. Wilson, 901 F.2d 378, 381 (4th Cir. 1990))); Owens, 549 F.3d at 415 ("`There is no Brady violation where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available... from another source, because in such cases there is really nothing for the government to disclose.'" (alteration in original) (quoting Coe, 161 F.3d at 344)); Xydas, 445 F.2d at 668 (holding that nondisclosure of witness' grand jury testimony did not violate Brady because reasonably diligent defense counsel would have interviewed the witness regardless of the nondisclosed information).
[10] Likewise, because ER 608(b) does not allow impeachment by extrinsic evidence, the documents were inadmissible to impeach Rennebohm on specific instances of conduct relating to truthfulness.
[11] Because Mullen's health insurance authorization is the only evidence held but not disclosed by the State, it is the only item of evidence that properly requires analysis under the Brady materiality test. However, the nondisclosed evidence, even when considered collectively, does not demonstrate the reasonable probability of a different outcome required under Brady. See Kyles, 514 U.S. at 436, 115 S.Ct. 1555.