IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| STATE OF WASHINGTON, | No. 84631-1-I |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| ANTHONY SHRONE PERSON, | |
| Appellant. | |

BOWMAN, J. — A jury convicted Anthony Shrone Person of 18 counts of sexually assaulting his minor daughters. Person argues the trial court erred by denying several of his pretrial motions and the prosecutor committed misconduct by improperly commenting on his constitutional right to prearrest silence. Person also claims cumulative error deprived him of his right to a fair trial. We affirm.

FACTS

In 2011, Person and his wife Ramona Jones[1] lived in Shelton. Together they have 11 children, including Jones' daughter from a previous relationship, A.A. That June, two of their daughters, 15-year-old O.P. and 14-year-old M.P., began working at a Burger King on the Fort Lewis military base, Joint Base Lewis-McChord (JBLM).

---

[1] Jones divorced Person in 2018.

This opinion bases the citations and pin cites on the Westlaw online version of the cited material.

In August 2011, Person filed a missing person report after O.P. ran away from home. Soon after, the military found O.P in the barracks at JBLM and investigated two soldiers for sexually assaulting both O.P. and M.P. During their interviews, the soldiers claimed that O.P. and M.P. disclosed sexual abuse by Person. The military police did not ask O.P. and M.P. about the allegations, but they referred the case to the Department of Social and Health Services (DSHS).[2] Child Protective Services (CPS) contacted O.P. and M.P., but the girls did not disclose any sexual abuse by Person. CPS then referred the matter to the Shelton Police Department (SPD). SPD sent detectives to Person's home, but O.P. and M.P. "refused to cooperate."

Several years later in February 2018, A.A., O.P., and M.P. reported to police that Person sexually assaulted them as children. In April 2020, the State charged Person with 12 counts of sexual assault. As to A.A., the State charged Person with one count each of first and second degree child molestation and second degree incest. As for O.P., the State charged Person with one count each of first, second, and third degree rape of a child; first, second, and third degree child molestation; and first degree incest. And for M.P., the State charged Person with one count each of second degree child molestation and second degree incest.

---

[2] In her report, the special agent with the military police who investigated the matter and referred it to DSHS said that Person hired an attorney from Connolly Law Offices to represent the children, so she "can[ ]not talk with them." She also noted that "dad is a very slick talker."

In June 2020, the trial court issued a warrant for Person's arrest. In July, police found him living under a different name in Michigan. Police arrested and extradited Person to Mason County. The court arraigned Person and set bail at $250,000.

On September 18, 2020, the State amended the information to add six more counts. For the charges related to A.A., the State added one count each of first, second, and third degree rape of child, third degree child molestation, and first degree incest. And for O.P., the State added one count of second degree incest.

<u>Pretrial Motions</u>

In November 2020, Person moved to represent himself. The court granted his motion but also appointed standby counsel. Twice, Person asked the court to waive his bail and release him on his personal recognizance. The court denied both motions, finding each time that Person was a flight risk because he resides in Michigan and a community safety risk because of the seriousness and number of charges against him.

Person then sought to interview Jones, A.A., O.P., and M.P. Jones, A.A. and M.P. agreed to the interviews but would not agree to Person interviewing them. O.P. also agreed to an interview but refused to have Person present during her interview. So, Person drafted questions for his standby counsel and court-appointed investigator to ask during the interviews. Person did not attend O.P.'s interview. Person planned to attend Jones' and A.A.'s interviews, but he cancelled the morning of the interviews, telling jail staff he was sick. Person's

standby counsel and investigator conducted each interview and later provided summaries of the questions and answers to Person.[3]

After the interviews, Person moved to depose the witnesses, arguing that they refused to discuss the case and that "their testimony is material and necessary." Person also moved to dismiss the charges for "government misconduct," arguing that the prosecutor suppressed documents related to the 2011 sex abuse investigation. He argued the 2011 investigation showed that the witnesses previously denied any physical or sexual abuse, contradicting their later statements to police in 2018.

On December 30, 2020, the court heard both motions. It denied Person's motion to dismiss, concluding that the State provided Person with all known documents related to the 2011 investigation. As to Person's motion to depose, the trial court noted that it did not have enough information to address whether the witnesses refused to answer material questions during their interviews. The court denied Person's motion without prejudice so that he could "supplement his request by providing specifically what it is that's being refused."

In a hearing on January 5, 2021, Person renewed his motion to depose and reasserted the same arguments. The court noted that Person seemed to have a "very thorough understanding" of the details of the 2011 investigation, so

---

[3] The record suggests that Person never interviewed M.P. At a hearing on December 30, 2020, the State noted that "three of the four State witnesses . . . have given a pretrial interview voluntarily to standby counsel and a private investigator." In February 2021, the State told the court it was trying to arrange the "fourth and final interview." And at trial, Person asked for a continuance so that his private investigator could interview M.P. But at that time, M.P. declined the interview.

it was unclear what information he would gain by deposing the witnesses. The court determined that the information was not material and denied the motion.

On January 19, 2021, Person filed a "Motion for Dismissal on Grounds of Spoliation of Evidence" under Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). The court heard the motion in February. Person claimed that the Mason County Sheriff's Office (MCSO), SPD, DSHS, and CPS possessed additional documents related to the 2011 investigation. And he argued that the State violated its obligations under Brady by failing to preserve and disclose the information. The State again told the court it gave Person "all the evidence it has in its possession" and knew existed. The State explained that after submitting public disclosure requests, it gave Person 160 pages of investigative documents from the military, CPS, and SPD. In March 2021, the court denied Person's motion in a memorandum decision, explaining that he did not identify any material or exculpatory evidence withheld by the State.

Trial Testimony

At trial, Jones characterized Person as an "authoritarian," who physically and verbally abused her and the children. She stated that when SPD and CPS investigated the allegations of child abuse in 2011, Person "dictated" O.P. and M.P.'s cooperation with the investigation and "instructed" them how to answer questions. And she said that Person told her to "keep [her] mouth shut, not to talk about anything, let them do the work." On cross-examination, Jones said she did not see Person sexually assault their daughters and "was not aware of any sexual abuse in the home."

5

A.A., O.P., and M.P. all testified that Person sexually assaulted them. A.A. testified that Person began abusing her when she was 8 years old. The abuse ended when A.A. was 15, after he thought she was pregnant. A.A. then became concerned that Person started to abuse O.P. O.P. testified that Person began sexually assaulting her when she was 8 years old. She said the abuse continued until she was 16. And while M.P. did not remember when Person began abusing her, she said that Person repeatedly touched her before she turned 14 years old.

On cross-examination, O.P. and M.P both admitted that they denied Person sexually assaulted them during the 2011 investigation. O.P. testified that Person "ordered" her not to cooperate with the investigation. But M.P. said that Person did not "force[ ]" her to deny the abuse.

A jury convicted Person on all counts. Person appeals.

ANALYSIS

Person argues the trial court erred by denying several pretrial motions and the prosecutor committed misconduct by eliciting testimony about his right to prearrest silence and commenting on that right in closing argument. He also argues that cumulative error compels us to reverse his conviction.[4]

Pretrial Motions

Person contends that the trial court erred by denying several of his pretrial motions. We address each argument in turn.

_____

[4] Person also argues that the trial court violated his right to a fair and impartial jury by seating a biased juror. But he conceded at oral argument that the allegedly biased juror was struck during peremptory challenges and did not sit on the jury.

a)  Imposition of Bail

Person argues the trial court erred by imposing $250,000 in bail without first inquiring into his financial circumstances.  Person concedes that the issue is moot but argues that we should consider his argument as a matter of continuing and substantial public interest.  We disagree.

"An issue is moot if we can no longer provide effective relief."  State v. Ingram, 9 Wn. App. 2d 482, 490, 447 P.3d 192 (2019).  We cannot generally provide a convicted appellant with effective relief on a pretrial bail issue because "pretrial bail is no longer available to him."  Id.  Still, we may consider a moot issue if it involves a matter of continuing and substantial public interest.  Id.

To determine whether a matter is of continuing and substantial public interest, we look to "(1) the public or private nature of the issue, (2) whether guidance for public officers on the issue is desirable, and (3) the likelihood that the issue will recur."  Ingram, 9 Wn. App. 2d at 490.  And we assess " 'the likelihood that the issue will escape review because the facts of the controversy are short-lived.' "  State v. Huckins, 5 Wn. App. 2d 457, 463, 426 P.3d 797 (2018)[5] (quoting Westerman v. Cary, 125 Wn.2d 277, 286-87, 892 P.2d 1067 (1994)).

Quoting Ingram, 9 Wn. App. 2d at 490,[6] Person says his argument amounts to a continuing and substantial interest because " 'the setting of bail is an issue of a public nature and there is currently a dearth of cases addressing

_____

[5] Internal quotation marks omitted.

[6] Internal quotation marks omitted.

bail issues.' " But Ingram squarely addresses Person's argument.  In that case, the defendant argued that the trial court violated CrR 3.2(d) by failing to consider less restrictive conditions of release when setting bail.  Id. at 496.  We agreed, noting that the trial court also failed to inquire into the defendant's financial circumstances.  Id.  We held that before imposing bail, the trial court

> must consider, "on the available information, the accused's financial resources for the purposes of setting a bond that will reasonably assure the safety of the community and prevent the defendant from intimidating witnesses or otherwise unlawfully interfering with the administration of justice."

Id. (quoting CrR 3.2(d)(6)).

Contrary to Person's argument, his alleged bail issue has not evaded review.  And addressing his argument here would add no new guidance for public officers.[7]  We decline to review Person's moot claim.

b)  Deposition of Witnesses

Person argues the trial court erred by refusing to order that Jones, A.A., and O.P. submit to depositions.  We disagree.

We review a trial court's ruling on discovery motions for abuse of discretion.  State v. Blackwell, 120 Wn.2d 822, 826, 845 P.2d 1017 (1993) ("The scope of criminal discovery is within the trial court's discretion.").  The trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons.  State v. Lile, 188 Wn.2d 766, 782, 398 P.3d 1052 (2017); see State v. Finch, 181 Wn. App. 387, 394-95, 326 P.3d 148 (2014)

---

[7] The State argues we should not address Person's argument because he "has not provided the record of the hearing at which bail was initially imposed."  Because we reject Person's assignment of error as moot, we do not address the State's argument.

(court abused discretion in granting defendant's pretrial request to order alleged victim to submit to polygraph test).

In general, a criminal defendant has no right to depose prospective witnesses before trial. State v. Mankin, 158 Wn. App. 111, 121, 241 P.3d 421 (2010). But under CrR 4.6(a)(2), the trial court may order a deposition if "a witness refuses to discuss the case with either counsel and the witness' testimony is material and necessary."

Before trial, Person moved to depose Jones, A.A., and O.P. Person argued that during their interviews, the witnesses refused to answer questions related to the 2011 sex abuse investigation. And he claimed that their testimony about the investigation was material to his defense as impeachment evidence. The trial court denied Person's motion but allowed him to "supplement his request by providing specifically what it is that's being refused." Person did not supplement the record. Instead, at an unrelated hearing a week later, Person renewed his motion to compel witness depositions and reasserted the same arguments. The court again denied the motion and ruled that the information Person sought was not "material" because he still had not shown that the depositions would provide information that Person did not "already know."

Three days after the trial court denied his motion, Person filed several documents with the court, including a copy of the written questions he gave to his private investigator and standby counsel to use at the interviews. And he

provided his private investigator's notes from the interviews.[8]  But Person did not renote his motion to depose witnesses or otherwise alert the trial court that he filed the documents.  Even so, none of the documents filed by Person show that the witnesses refused to answer material questions at their interviews.  The trial court did not abuse its discretion by denying Person's motion to depose the witnesses.

> c)  Brady Violation

Person argues that the State violated its obligations under Brady by either destroying or failing to disclose exculpatory information from the 2011 sex abuse investigations.  We disagree.

Under Brady, the State has an obligation to disclose all evidence in its possession favorable to the accused, even if not requested by the defendant. Brady, 373 U.S. at 87; State v. Mullen, 171 Wn.2d 881, 894, 259 P.3d 158 (2011).  The obligation extends to evidence possessed by law enforcement. Mullen, 171 Wn.2d at 894.

To establish a Brady violation, a defendant must show that (1) the evidence at issue favors the accused because it is either exculpatory or impeaching, (2) the State willfully or inadvertently suppressed the evidence, and (3) the evidence was material.  State v. Davila, 184 Wn.2d 55, 69, 357 P.3d 636 (2015); see In re Pers. Restraint of Mulamba, 199 Wn.2d 488, 503, 508 P.3d 645

---

[8] Person also filed his private investigator's proposed questions to M.P., summary transcripts of police interviews of M.P. and her younger brother J.P., summary transcripts of a call between J.P. and an unknown person called "Mookie," an e-mail from Person's friend David Hill alleging Jones is generating "false sex allegations to incarcerate" Person, and a summary transcript of A.A.'s interview with the private investigator.

(2022) (the terms "materiality" and "prejudice" are interchangeable under the third Brady prong).

But the State need not disclose information that it does not possess or of which it is unaware. Mullen, 171 Wn.2d at 895. And the State does not commit a Brady violation when " 'a defendant has enough information to be able to ascertain the supposed Brady material on his own.' " Id. at 896 (quoting United States v. Aichele, 941 F.2d 761, 764 (9th Cir. 1991)). We review an alleged Brady violation de novo. Mulamba, 199 Wn.2d at 498.

Person argued below that law enforcement agencies possessed documents related to the 2011 investigation, that the State was aware of those documents, and that it failed to disclose or preserve them. The State told the court that it submitted public records requests to MCSO and SPD and provided everything it had to Person, including 160 pages of investigation done by the military police at JBLM and CPS. Still, Person claimed that other law enforcement agencies must have been involved in the investigation because

> when you look at [SPD's] policy [manual], there's steps A through G they're supposed to follow. They're supposed to coordinate with other investigating agencies. They're supposed to coordinate with DSHS, CPS, et cetera.[9] There's a lot of steps for them to follow. And so I asked for that material, and I have yet to receive that material.

But Person did not show that other law enforcement agencies participated in the

---

[9] Person's list of involved agencies continued to grow throughout the proceedings. At the time of trial, Person identified the Federal Bureau of Investigation, Pierce County Sheriff's Department, Tacoma Police Department, United States Army judge advocate general lawyers from JBLM, Mary Bridge Children's Hospital, Oakland Bay Pediatrics (now Mason Clinic Pediatrics), and Connolly Law Offices as agencies in possession of exculpatory information.

2011 investigation. Nor did he show that the investigation generated additional documents that would include exculpatory information.

In its memorandum decision, the trial court denied Person's motion, explaining:

> The Court is unable to begin the [Brady] analysis because the Defense has failed to identify any material exculpatory evidence. The Defendant is relying upon an assumption that a more thorough investigation was performed by [MCSO] and/or [SPD] and that documents memorializing the investigation were subsequently destroyed. However, outside of Defendant's assumptions and conclusions based upon those assumptions, there is no support for such proposition.

We agree with the trial court. Person fails to show that the State violated its obligations under Brady.[10]

Prosecutorial Misconduct

Person argues that the prosecutor committed misconduct by improperly eliciting testimony and commenting on Person's constitutional right to prearrest silence. We disagree.

To prevail on a claim of prosecutorial misconduct, the defendant must show that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and circumstances at trial. In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). To establish prejudice, the defendant must show a substantial likelihood that the misconduct affected the jury verdict. Id. When, as here, the defendant does not object to the misconduct

---

[10] Person also argues that the trial court erred by denying his motion to dismiss under CrR 8.3(b) for government misconduct. Person alleged the State committed misconduct by failing to provide documents related to the 2011 investigation. For the same reasons as discussed above, we conclude the trial court did not err by rejecting his CrR 8.3(b) claim.

at trial, he waives any error unless the misconduct was so flagrant and ill intentioned that an instruction would not have cured the prejudice. Id.

We construe the United States Constitution's Fifth Amendment privilege against self-incrimination liberally, prohibiting the State from using a defendant's prearrest silence as substantive evidence of guilt. State v. Easter, 130 Wn.2d 228, 236-37, 922 P.2d 1285 (1996). Nor may the State use a defendant's silence to "suggest to the jury that the silence was an admission of guilt." State v. Lewis, 130 Wn.2d 700, 707, 927 P.2d 235 (1996). But the State does not violate the constitution when referring to prearrest silence to impeach a defendant's testimony. State v. Burke, 163 Wn.2d 204, 217, 181 P.3d 1 (2008).

Person first argues that the prosecutor committed misconduct by eliciting testimony from SPD Patrol Sergeant Daniel Patton[11] that Person "chose not to speak with police prior to being arrested." But the record shows that it was Person who first mentioned his prearrest silence and that the State elicited Sergeant Patton's testimony in rebuttal.

At trial, Person testified:

> 2019 January, I got a call from Officer Patton. Hi, this is Officer Patton with [SPD], child abuse allegations. This was about June, 2019. I was like no, I don't want to talk about it, because I was tired of being prodded and probed. Originally, I thought it was about Fort Lewis, that whole thing, following up on that. Didn't hear anything.

He went on to testify:

> [W]hen I received word that false statements were made, false allegations were made, I did what I did in 2011, June. I notified

---

[11] Sergeant Patton was a detective when SPD began investigating the sexual assault allegations against Person in 2018.

Officer Patton on two separate occasions, July 20th, July 1st, around July 1st, 2020 and August, 2020. I notified the private investigator . . . in July, 2020, August, 2020. I even sent a recorded conversation to them on two separate occasions. No follow-up.

The State then called Sergeant Patton back to the stand to impeach Person's claim that he tried to reach out and provide the officer exculpatory information:

Q.    Detective Dan Patton, when you were investigating this case in 2018, as - your previous testimony was that you investigated the case, you interviewed the alleged victims and then you would attempt to reach out to the alleged suspect. Is that correct?
A.    Yes.
Q.    Did you attempt to reach out to the alleged suspect, Anthony Person, in 2018?
A.    Not in 2018. I think it was - one second - 2019.
Q.    Alright. So, I'll rehash. The investigation continued. The initial allegations came in 2018, but the investigation carried over to 2019?
A.    Correct. At some point I made contact - communication contact with Mr. Person.
Q.    Okay. And did Mr. Person cooperate with your investigation?
A.    Mr. Person declined to discuss the investigation with me.
Q.    Did Mr. Person reach out to you himself?
A.    In roughly July, about 2020.
Q.    So that would have been after charges were filed?
A.    That was after charges were filed.
Q.    Are you able to speak to a defendant after charges have been filed?
A.    Only on very, very rare occasions, and definitely not just me and the defendant. It would have to be with the defendant's attorney and ideally initiated by the defendant's attorney to secure those Sixth Amendment[12] rights, protecting his constitutional rights.
Q.    Did the defendant provide you any documentary evidence?
A.    He verbalized to me that he wanted me to get in contact with someone. Once again, I was very uncomfortable speaking to him because the charges had been filed and I didn't want to violate any constitutional rights, and I requested that he

---

[12] U.S. CONST. amend VI.

contact his legal representative to communicate with me, and that was the only discussion that we had.

Q.     Thank you.  I have no further questions.

Because the State offered Sergeant Patton's testimony only to impeach Person's claims, and the prosecutor did not argue or suggest that Person's noncooperation implied consciousness of guilt, we conclude that the prosecutor's questions do not amount to misconduct.

Person next argues that the prosecutor committed misconduct in his closing argument by saying that Person "slammed the door" on police during their investigation.  But, taken in context, the prosecutor's comment did not relate to Person's prearrest silence in 2020.  Rather, the prosecutor used the phrase to describe Person's efforts to interfere with the 2011 investigation into O.P. and M.P.'s disclosures.

When asked about the 2011 investigation at trial, Jones explained that Person dictated the family's answers to questions from police and DSHS:

Q.     Ms. Jones, so you were aware of a[n] investigation that occurred on JBLM surrounding your daughters [O.P.] and [M.P.]?
A.     Correct.
Q.     And that investigation, is it - who dictated that - did that follow-up investigation?
A.     Anthony Person did.
Q.     Okay.  In any of the interviews that you provided to DSHS, was that influenced or dictated by any individual?
A.     Yes, it was.
Q.     And who was that influenced and dictated by?
A.     Anthony Person.
Q.     And what was your biggest fear in complying with a DSHS investigation?
A.     That they would take my children out of the home.
Q.     Okay.  And as a result of the investigation that occurred based upon preliminary allegations from JBLM, isn't it true that Anthony Person hired an attorney?

15

A.    He did.

Q.    Isn't it true that Anthony Person dictated [O.P.]'s and [M.P.]'s cooperation in the investigation?

A.    He did.

Q.    Were you ever instructed how to answer questions in regards to an investigation?

A.    I was.

Q.    And what were your instructions?

A.    To keep my mouth shut, not to talk about anything, let them do the work.

Q.    And were those instructions levied down by the defendant, Anthony Person?

A.    They were.

Similarly, O.P. testified that Person instructed her not to answer questions

in the 2011 CPS investigation:

A.    We weren't allow[ed] to talk to the police at all because Anthony would be sent away if we did.  He reinforced that. Anthony was the main person who dealt with law enforcement if they showed up to the door or not.

. . . .

Q.    And when you were [working at JBLM] did you disclose - have any disclosures about the sexual abuse?

A.    Yes, I did.

Q.    And was that investigated?

A.    It was disclosed through a man I was dating.  I had told him I was being sexually abused.  And detectives did come out. They knocked on the door, they had a piece of paper in their hand.  I couldn't really read it.  I said yes to it, there was sexual abuse in there.  I thought it was - but yes, after they left we were basically - not basically, we didn't have no choice - Anthony was just telling people to keep our mouth shut or, you know, just be very intimidating.  And so, CPS did come out.

Q.    Okay.  And did you make any disclosures of sexual abuse to CPS?

A.    No, I didn't.

Q.    And why could you not?

A.    I was afraid if I did Anthony would fly off the handle, somebody would seriously be just - Anthony would just get into these moments where he would be on the verge of getting ready to kill you, seriously.

Q.    Okay.  And —

16

A. And that just could vary. Like, it could be your brother. You know, if he was mad about something he would just snap. I jumped in a couple of times to help my brother or my mother. He would turn around and just beat you until you couldn't breathe.

During closing argument, Person repeatedly referred to O.P.'s and M.P.'s denials of sexual abuse in 2011. He asserted that "the accusations have not been completely and thoroughly investigated by law enforcement in this particular case. . . . It was alleged in the past, it was investigated, unfounded. We still don't have any findings." Responding to Person's comment, the prosecutor told the jury that Person "wants to rely on this [2011] investigation, but you don't have any of that investigation. Why? Because it was unable to be completed because of his control, his influence." The prosecutor explained that "it would have been . . . nice" if O.P. and M.P. did not endure Person's control, but "[n]ope, we didn't have that. Anthony Person slammed the door on law enforcement. But he wants you to believe this long investigation, two-plus years long, exonerates him."

In context, the prosecutor's comment referred to Person's efforts to control the 2011 investigation and aimed to rebut Person's argument that the sexual assault allegations were "unfounded." We conclude that the argument does not amount to a comment on Person's constitutional right to prearrest silence.

Cumulative Error

Person argues that the cumulative error doctrine entitles him to a new trial. Application of the cumulative error doctrine "is limited to instances when there have been several trial errors that standing alone may not be sufficient to justify

17

reversal but when combined may deny a defendant a fair trial." State v. Greiff, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). Because we find no error, the cumulative error doctrine does not apply.

The trial court did not err by denying Person's pretrial motions. Nor did the prosecutor commit misconduct by using Person's prearrest silence to impeach his testimony. And because Person cannot show any errors at his trial, the cumulative error doctrine does not apply. We affirm.

_____, J.

WE CONCUR:

_____          _____