# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71125-3-I |
| Respondent, | ) ) ) | DIVISION ONE |
| v. | ) ) | UNPUBLISHED OPINION |
| CHRISTY R. DIEMOND, | ) ) ) | |
| Appellant, | ) | FILED: April 20, 2015 |

TRICKEY, J. — To prevail on a Brady[1] claim, a defendant must show that the State suppressed evidence favorable to the defendant as a result of which the defendant was prejudiced. Here, there were multiple witnesses to the condition of the two horses that support the defendant's conviction of two counts of first degree animal cruelty. The failure to produce evidence that could be used to impeach a witness whose testimony was cumulative was not material as it did not undermine the confidence in the jury's verdict. We affirm the judgment and sentence.

## FACTS

Christy Diemond owned two elderly horses, Bud and Brandy. Both horses were pastured at her property in Woodville. Jennie Edwards, director of a horse rescue group, Hope for Horses, sent an e-mail to Sgt. Bonnie Sole of the King County Sheriff's Department regarding the poor condition of the horses.

Sgt. Sole had extensive familiarity with horses, having owned them continuously since the age of 15 and had also been trained in their proper care and feeding. On Saturday, February 26, 2011, Sgt. Sole went to the property and noted that the horses

---

[1] Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

were thin and that their blankets did not fit correctly. In fact, the horses appeared very gaunt. Sgt. Sole also testified that bark had been eaten off the trees. This, she said, was an indication that the horses were hungry. Sgt. Sole did not take any photographs, but testified that the photographs presented at court accurately presented the conditions at the time that she saw the horses.

Diemond told Sgt. Sole that she had not yet fed the horses that day even though it was 11:00 a.m. She also stated that she had been trying to find the horses a home, but had been unsuccessful. Sgt. Sole offered to help feed the horses and accompanied Diemond to the garage where the feed was kept. Diemond placed a couple of inches of feed into a bucket and filled the bucket half way with water. She explained that she fed this amount to the horses twice a day, along with some hay, but not much because they were not able to eat it. Sgt. Sole noted that the horses came up and ate rapidly.

Sgt. Sole placed her hand underneath Bud's blanket and felt the rib bones. Sgt. Sole also noticed a sore on Brandy's withers. Sgt. Sole adjusted Brandy's blanket to avoid rubbing the putrid sore which was oozing pus. Diemond told Sgt. Sole that the wound had occurred recently. When Sgt. Sole suggested that Diemond have a veterinarian look at the sore, Diemond explained that she was overwhelmed and did not have any money. Diemond told Sgt. Sole that she was willing to give up the horses.

Sgt. Sole returned about 1:30 p.m., but Diemond was not there. At that time, Sgt. Sole put out more hay for the horses and called animal control. On Sunday, February 27, Sgt. Sole went back on her own initiative bringing hay from home that might be easier for the hoses to eat. The water in the tub was still frozen solid.

2

Jenee Wesenberg, an animal control officer for King County, responded to the call. She saw the horses in the pasture and made contact with Diemond. Wesenberg noticed their spines sticking up even through the blankets. Wesenberg also noticed that bark had been eaten off the trees and that water was frozen in the trough. Wesenberg felt Bud's thinness, but Brandy would not let her. Wesenberg testified that horses do not eat bark off the trees unless they are hungry. Diemond told Wesenberg that she was having financial difficulties and had not been able to care of the horses and was looking for resources to take them. Wesenberg testified that the horses looked emaciated.

Wesenberg's supervisor suggested that she contact Dr. Hannah Mueller. When Diemond, Wesenberg, and Dr. Mueller all met at the property on Sunday, February 27, 2011, Diemond was still willing to surrender the horses. Diemond said that someone had knifed the horses. While Wesenberg was speaking with her, Diemond asked if she could record the conversation with the veterinarian. Both Wesenberg and Dr. Mueller agreed. Neither had heard the recording.

Diemond explained to them that she feeds two scoops of food, one scoop of senior equine and one scoop of Dairy 16, two times a day for each horse. Dairy 16 is a feed for cows and Wesenberg was unaware of it being given to horses. Diemond said it was recommended to her by the feed store.

Carole Gallagher, an employee of DeYoung's Farm & Garden feed store at the time, has a degree in animal science from Washington State University. Gallagher owned three horses, and had owned several elderly horses in the past. She testified that a 1,000 pound horse eats approximately 13 1/2 pounds of feed a day. Gallagher also stated that

Diemond shopped at the feed store and used the same farrier that she did. It was that farrier who suggested that Diemond speak with Gallagher regarding the appropriate feed.

When Diemond told Gallagher that she was feeding the horses Dairy 16, Gallagher explained that the feed was formulated for ruminants, dairy cows, rather than horses, and recommended that she feed them Purina Mills Equine Senior, a sweeter feed more palatable to horses that contained added fat digestible by horses. Diemond told her that she had been a customer at the feed store longer than Gallagher had worked there. Gallagher testified that an older animal, at 600 pounds, needs to be fed 8 pounds of feed, and 800 pound horse should be fed 10 1/2 pounds of feed just to maintain their weight.

Diemond told Dr. Mueller that she did not believe in vaccinating, had no funds to pay for their dental care, and believed that she did not need a veterinarian because she had a farrier. Diemond told Dr. Mueller that she received nutritional advice from the feed store. Diemond also told Dr. Mueller that someone was poisoning her horses to make them thin and that someone had cut Brandy.

Dr. Mueller was called as the State's expert witness. Dr. Mueller owns her own equine facility and has worked extensively with local rescue organizations to provide professional local care for their horses. Dr. Mueller explained that when she received a call from animal control, she referred them to a network of rescues to find an organization that could take the horses. In this instance, it was SAFE (Save a Forgotten Equine).

Dr. Mueller first went through a list of questions that she asked to obtain a medical history. She learned that Diemond had the horses for a number of years, owning Bud since 1991 and Brandy much longer. Diemond did not provide routine normal dental care for the horses' teeth. Dr. Mueller was not able to obtain a clear answer on how long the

4

blankets had been on the horses other than it was sometime in December and that Diemond had not checked the blankets. Dr. Mueller's testimony described the amount of food fed to the horse as "outrageous. Nowhere near enough."[2] She also noted the frozen water in the trough.

Dr. Mueller's physical exam noted extensive clinical signs of starvation. She arrived at this conclusion by using a body condition score (BCS), which is an objective assessment tool that rates horses from 1 to 9 and requires both a visual and hands-on examination and palpation of a horse's fat content in six different areas. A score between one and two signifies emaciation. Bud exhibited severe dental pathology and was in need of significant dental work. The average horse's teeth are floated once a year.

Bud's feet indicated that there had been some hoof care within the last few months, but the hooves were long and out of balance, indicating that trimming had not been consistent. Bud's coat was dull and filthy, crusted with dirt and debris, and it appeared that he had not been groomed in some time. Bud's eyes had discharge and his skin exhibited rain rot. When Dr. Mueller placed her hands on Bud, she noted that there was no fat on his neck, behind his withers, shoulders, or over his ribs. His vertebra were protruding along his sides. Bud's mucous membranes were blue and gray. A healthy horse's gums are pink.

Brandy's temperature, pulse, and respiration were all within normal limits. Dr. Mueller found a significant heart murmur, which is common of a neglected, emaciated horse. As a horse gains weight, there is a change in its blood viscosity. Brandy, like Bud, had her head down, her eyes were dull and depressed, and her coat was dull and dirty.

---

[2] 4 Report of Proceedings (Oct. 3, 2012) at 42.

Dr. Mueller also observed rain rot and a blanket wound on Brandy's withers. The front end of the blanket was digging into her wound every time she took a step, similar to having a blister on the human foot.

Like Bud, Brandy had abdominal distention and Dr. Mueller could feel nothing but bones under the hair with very little fat content. Brandy's teeth were worse than Bud's, with some rotting in the sockets. Brandy also had a small wound on her hind distal below the fetlock.

Dr. Mueller testified that horses are fed on their ideal weight not on their emaciated weight. The ratio of feed needed is 1 to 2 pounds per 100 pounds of body weight. She estimated that Brandy and Bud were approximately 200 hundred pounds underweight.

The horses were taken to Dr. Mueller's equine rehabilitation center where Bud and Brandy began to gain weight. They were fed 14 cups of grass/hay pellets, 8 cups of alfalfa pellets, 4 cups of beet pulp, and 2 cups of senior equine. In addition to the 11 pounds of grain, the horses were fed 6 pounds of hay daily. Previously they had been fed less than three pounds a day.

Brandy's blood count was within normal limits and her infections were not systemically noted in the blood work, even though they were clinically obvious. Her glucose was low, which is consistent with starvation, as was the AST (a liver and muscle enzyme).

Dr. Mueller opined that the horses had been emaciated for quite some time and were in obvious pain. After two months at her facility, the horses had a BCS of 3.5 (ideal score being a 5). At that point, the horses were transferred to SAFE.

Dr. Gilbert Paul Mabrey, an attorney who previously practiced veterinarian medicine with a focus on horses, testified as an expert for the defense. He reviewed the statements from Wesenberg and Sgt. Sole, the medical records and lab reports, as well as journals and articles. Dr. Mabrey disagreed with Dr. Mueller's diagnosis and opined that there was insufficient evidence to establish starvation because the blood work was for the most part in the normal range.

He testified that horses like to eat trees, stating that if they do not get enough roughage, they will eat wood. Dr. Mabrey also disputed Dr. Mueller's opinion that the animals were in pain. He opined that pain and suffering only existed when the animal can no longer tolerate it.

Based on the photographs he viewed, he disagreed with Dr. Mueller's BCS of Bud and Brandy. Dr. Mabrey did not conduct an examination of the horses himself.

Diemond did not testify. In closing arguments, counsel primarily focused on the divergent expert testimony. A jury convicted Diemond of two counts of first degree animal cruelty. By special verdict, the jury found Diemond guilty of animal cruelty by starvation but not by dehydration.

After the verdict, but prior to sentencing, the prosecutor learned of potential impeachment evidence against Wesenberg. That evidence included a shoplifting arrest in 2006, a 2008 deferred sentence for attempted drug possession that was dismissed in 2009, and a four-day suspension from work for lying about her attendance at a training and the number of hours she had worked on a particular shift. Diemond moved for a new trial based on ineffective assistance of counsel and a potential Brady violation.

7

The State conceded in argument that some information contained in the police reports would probably have been admissible under ER 608. That information included Wesenberg's lies that she had been at a training when she was not, worked a full day when she did not, and her claim that she was on call when she was not.

The trial court denied the motion for a new trial. Diemond appeals.

ANALYSIS

In Brady, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In addition to exculpatory evidence, the use of evidence impeaching a government witness by showing bias or interest falls within the Brady rule. United States v. Bagley, 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).

"Evidence is material 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" State v. Thomas, 150 Wn.2d 821, 850, 83 P.3d 970 (2004) (quoting Bagley, 473 U.S. at 682), abrogated in part on other grounds by Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004); In re Pers. Restraint of Benn, 134 Wn.2d 868, 916, 952 P.2d 116 (1998). In other words, when the credibility of a witness may be determinative of guilt, the failure of the prosecutor to disclose material evidence regarding that witness's credibility violates due process and requires a new trial if there is a reasonable likelihood that the absence of such evidence affected the jury's determination. Applying the "'reasonable probability' standard, the question is whether the defendant received a fair trial without the evidence—that is, 'a trial resulting in a verdict

8

worthy of confidence.'" Thomas, 150 Wn.2d at 850-51 (quoting Kyles v. Whitley, 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995)).

In determining whether an error infringing a defendant's right to cross-examine was harmless, we consider "the importance of the witness'[s] testimony, whether the evidence was cumulative, the extent of corroborating and contradicting testimony, the extent of cross-examination otherwise permitted, and the strength of the State's case." State v. Buss, 76 Wn. App. 780, 789, 887 P.2d 920 (1995), overruled on other grounds by State v. Martin, 137 Wn.2d 774, 975 P.2d 1020 (1999). Here, the focus of the trial was the testimony of the two experts. Further, the testimony presented by Wesenberg was merely cumulative as the condition of the horses was observed by both Sgt. Sole and Dr. Mueller.

Before a constitutional violation occurs under Brady, three elements must be satisfied: (1) the State failed to disclose evidence that is favorable to the accused, either because it is exculpatory or impeaching; (2) the State suppressed the evidence either willfully or inadvertently; and (3) the undisclosed evidence was prejudicial. State v. Mullen, 171 Wn.2d 881, 895, 259 P.3d 158 (2011). Diemond has failed to satisfy the third prong of the Brady test, that is, whether "'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" Youngblood v. West Virginia, 547 U.S. 867, 870, 126 S. Ct. 2188, 1685 L. Ed. 2d 269 (2006) (quoting Kyles, 514 U.S. at 435). The evidence was not material in the sense that if it had been disclosed to the defense, there is no reasonable probability that the result of the proceeding would have been different. Strickler v. Greene, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). Thus, as here, the impact of

impeachment evidence "may not be material if the . . . other evidence is strong enough to sustain confidence in the verdict." Smith v. Cain, ___ U.S. ___, 132 S. Ct. 627, 630, 181 L. Ed. 2d 571 (2012). The verdict here is worthy of confidence.

Statement of Additional Grounds[3]

Diemond also raises numerous issues in her statement of additional grounds, none support any relief on appeal. She raises issues that are not properly before us because the issues either refer to matters outside the trial record or require us to reweigh the evidence and evaluate the credibility of witnesses. It is for the trier of fact to evaluate witnesses' credibility and to determine the persuasiveness of material evidence. Thomas, 150 Wn.2d at 874-75.

Diemond contends that the trial court erred in failing to conduct a voir dire to a specific juror. However, there is nothing in the record to demonstrate any abuse of discretion. A party alleging juror misconduct has the burden to show that misconduct occurred. State v. Hawkins, 72 Wn.2d 565, 566, 434 P.2d 584 (1967). The record here is insufficient to review this contention.

Citing errors and omissions in the trial court transcripts, Diemond argues that the quality of the trial court record was insufficient to permit effective appellate review. But she fails to identify how any of these alleged errors or omissions are relevant to any issue raised in her appeal. Diemond made similar arguments below, but the trial court found that the transcripts were consistent with the judge's notes and recollection for the trial.

---

[3] The court granted Diemond's March 25, 2015 motion to supplement the record with the transcript from the November 30, 2012 hearing. However, supplemental clerk's papers and other documents submitted thereafter are untimely and were not considered by this court.

Thus, she has not shown that we have been prevented from effectively reviewing her case. State v. Putman, 65 Wn. App. 606, 611, 829 P.2d 787 (1992) (a record may be sufficient for review even if a verbatim report of proceeding is not available for each portion of the proceedings).

Diemond also claims that the photographs offered into evidence were altered as to when they were taken. These claims are based on alleged facts outside the record on appeal and therefore cannot be addressed on direct appeal. However, the witnesses all testified that the photographs accurately depicted their memory of the day and the condition of the horses, all of which the jury heard. The case did not rise or fall on the photographs.

There is no support in the record for Diemond's other contentions.

Affirmed.

Trickey, J

WE CONCUR:

Spearman, C.J.

Cox, J.

11