
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 33438-4-III |
| Respondent, | ) | (consolidated with |
| | ) | No. 35223-4-III) |
| v. | ) | |
| | ) | |
| JOSEPH PATRICK SULLIVAN, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |
| | ) | |
| | ) | |
| In the Matter of the Personal Restraint of | ) | |
| | ) | |
| JOSEPH PATRICK SULLIVAN, | ) | |
| | ) | |
| Petitioner. | ) | |

SIDDOWAY, J. — The State prosecuted Joseph Sullivan for resisting arrest and for the third degree assault of a police officer, advancing the unusual theory that on the day of the crimes Mr. Sullivan anticipated a police encounter, and his wife and others gathered near the Grand Coulee Dam to see Mr. Sullivan stand up for his right to fish without interference by local police. Mr. Sullivan admits that upon being contacted by a Grand Coulee police officer and told he was trespassing, he asserted his right to fish and

demanded that a federal marshal be called. He denies striking the officer and claims he only acted in self-defense, but the State persuaded the jury otherwise. He now raises 10 assignments of error and, in a personal restraint petition consolidated with the appeal, asks for a reference hearing to determine when certain "no trespassing" or "restricted area" signs were installed near the dam.

We find no error, no abuse of discretion, and no basis for collateral relief. We affirm the convictions and dismiss the petition.

FACTS[1] AND PROCEDURAL BACKGROUND

On April 24, 2014, around lunchtime, Joseph Sullivan went fishing on the shoreline of the Columbia River below Grand Coulee Dam. Events occurring in the 10 days before his fishing outing are relevant to his convictions for resisting arrest and assaulting a police officer and to the jurors' weighing of some of the witness testimony.

On April 14, the Washington Department of Fish and Wildlife adopted an emergency rule that revised state recreational fishing regulation of an area from the Grand Coulee Dam downstream to the State Route 155 bridge. That section of water had been closed to public access and recreational fishing for over 13 years, for security reasons following the events of September 11, 2001. The emergency rule was to become effective the next day. On April 15, 2014, the public affairs officer for the United States

---

[1] Since jurors believed the State's case, we recount the evidence in the light most favorable to the State.

2

Bureau of Reclamation (BOR), which operates Grand Coulee Dam, sent electronic mail to approximately 500 Grand Coulee Power Office employees of the BOR, notifying them of the rule change.

On August 20 and 21, 2014, Tyler Mellick, who worked as an electrician at the dam, fished from an area of the shoreline affected by the state fishing rule change, but that was also located on BOR property near the dam that the agency treated as secure and posted as "restricted" or "no trespassing." He was contacted on both days by Officer Gary Moore of the Grand Coulee Police Department and told he could not fish in the posted area. The Grand Coulee Police Department was under contract to provide law enforcement services for the BOR.

On the first occasion, Mr. Mellick disagreed with Officer Moore but left as requested. The next day, however, he refused to leave, insisting he was within his rights. He asked, if the officer was going to press the point, that someone with the FBI or a U.S. Marshal, or someone else "with the authority of the federal government" be brought in. Report of Proceedings (RP)[2] at 513-14. Mr. Mellick was arrested and charged with trespassing.

On April 21—the same day as Mr. Mellick's arrest—the BOR public affairs office again sent electronic mail to the 500 or so Power Office employees, clarifying that on

_____

[2] Unless otherwise noted, citations to the report of proceedings are to the volume containing the trial, beginning on April 15, 2015.

3

both sides of the river, access under state and tribal fishing rules would permit fishing from that part of the shoreline north of posted areas, but did not affect access restrictions on the areas posted "'Restricted Area No Unauthorized Personnel Beyond This Point'" and "'No Trespassing on Road or Riverbank'" on the west side of the river, and "'Restricted Area No Unauthorized Personnel Beyond this Point'" on the east side. Ex. 72.

At the time of Mr. Mellick's arrest, he was well acquainted with the appellant, Joseph Sullivan, and with Mr. Sullivan's wife, Kathy Tesch. He had been living off and on in a travel trailer that the couple allowed him to park on their property, near their home. Mr. Mellick provided Mr. Sullivan with a copy of the BOR public affairs officer's original April 15 e-mail about the change in state fishing rules opening access below Grand Coulee dam. Mr. Mellick denies that he ever told Mr. Sullivan about his arrest before Mr. Sullivan was himself arrested and charged in the matter now on appeal.

On April 24, when Mr. Sullivan traveled to the shoreline below the dam to go fishing, he characterizes it as a coincidence that a handful of his friends and family were watching from different vantage points when Officer Joe Higgs responded to a call that Mr. Sullivan was fishing in a restricted area. At Mr. Sullivan's trial, the State would characterize the presence of so many observers as part of a "setup." RP at 170.

Mr. Sullivan was accompanied to the dam on April 24 by his wife, who had never gone fishing with him before. They parked their pickup at the end of a service road, next

4

to a gate on which was mounted a sign that said "No Trespassing on Road or Riverbank." RP at 577-78; Ex. 51. His wife stayed near the pickup with a pair of binoculars that she occasionally used to watch him fish after he walked to the riverbank below.

Mr. Sullivan was watched by Mr. Mellick, who stood next to a fence line approximately 207 yards from where Mr. Sullivan was fishing. Mr. Mellick saw Ms. Tesch in the parking lot above the posted gate and said hello. When he saw Officer Higgs arrive at the dam site and head toward Mr. Sullivan, he called Mr. Sullivan on his cell phone to tell him about the arriving officer.

Mr. Sullivan was watched by Robert Fields, another employee at the dam, who was a close friend of Mr. Mellick's and an acquaintance of Mr. Sullivan. Mr. Fields claimed he had no advance indication of any trouble that day, but when "word spread . . . that there was a police presence outside," he "went out to watch the circus." RP at 466. Like Mr. Mellick, Mr. Fields believed that there should be no restriction on fishing in the area where Mr. Sullivan was fishing and was also of the belief that only federal law enforcement, not Grand Coulee police officers, should have jurisdiction at the dam site.

Finally, Mr. Sullivan was watched by Daniel Conant Sr. and his then 18-year-old son, who arrived at the west side of the dam as Officer Higgs walked down through riprap to contact Mr. Sullivan. The Conants were acquainted with Mr. Mellick and joined him at the fence line where he was watching Mr. Sullivan and Officer Higgs's approach. Mr. Mellick admits telling the Conants, "this could get very interesting," but

5

denies suggesting that anyone should film what was about to happen. RP at 524. Mr.

Conant Sr. would later testify, however, that Mr. Mellick said "somebody might want to

film this, this could be good," prompting both Mr. Conant and his son to pull out their

cell phones and start recording the events about to transpire between Mr. Sullivan and

Officer Higgs. RP at 567.

The beginning of the younger Mr. Conant's video, which was later posted on

YouTube, captured the end of the cell phone conversation Mr. Mellick was having with

Mr. Sullivan as Officer Higgs picked his way through riprap toward Mr. Sullivan on the

shore:

> MR. MELLICK: . . . he's comin' up, comin' up right behind you, I got you. He's comin' up on your six. Allright, he's got, he's probably got about a hundred yards to go. Bye.

Ex. 60, at 0 min., 0 sec. through 0 min., 15 sec.

We turn from explaining the presence of so many witnesses to recounting the

police encounter itself. It was a dam security officer who, upon seeing Mr. Sullivan

arrive and begin fishing in a restricted area by the dam, contacted the Grand Coulee

Police Department, which dispatched Officer Higgs. When Officer Higgs arrived, dam

security pointed out where Mr. Sullivan was fishing.

After Officer Higgs worked his way down to the water and approached Mr.

Sullivan, he identified himself as a police officer and told Mr. Sullivan he was in a

restricted area and was not allowed to be there. Mr. Sullivan claimed he *was* allowed to

6

fish there and presented the officer with the April 15 BOR public affairs e-mail about the state fishing rule change. Officer Higgs reviewed it, but told Mr. Sullivan it was not the whole story. He told Mr. Sullivan that the area where he was standing was posted as restricted, pointing out the general direction of the signs. Mr. Sullivan asked for a fish and wildlife officer. Deciding that he would issue a written trespass warning to Mr. Sullivan at that point, Officer Higgs asked him for identification. Mr. Sullivan responded by asking for a federal marshal—just as Mr. Mellick had, when he was contacted by Officer Moore.

Officer Higgs explained that law enforcement for the site was contracted to his department and renewed his request for identification. He explained that Mr. Sullivan was already trespassing and if he did not produce identification it would turn into obstructing a law enforcement officer. When Mr. Sullivan continued to refuse to produce identification, Officer Higgs told Mr. Sullivan he was under arrest for trespassing and obstructing, and reached toward Mr. Sullivan's arm to place him under arrest. Mr. Sullivan responded by pulling his arm away and stepping to the officer's side. Officer Higgs told him not to pull away again, or he would be placed under arrest for resisting arrest as well. When Officer Higgs reached for his arm again, Mr. Sullivan, who is a martial arts grand master in the practice of Isshin-Ryu, an Okinawan style of karate, moved forward and punched the officer in the left thigh, just above the knee.

7

As Mr. Sullivan struck his leg, Officer Higgs grabbed the collar of Mr. Sullivan's jacket and turned, in an effort to pin him to the ground. A struggle ensued, in the course of which Officer Higgs lost his balance and both men ended up on the ground where they struggled further. After a short time, Mr. Sullivan started to calm down, the men talked, and they began to get up. Officer Higgs got in a position straddling Mr. Sullivan, so he had some control, but Mr. Sullivan continued to resist the officer's effort to pull his arm into position for arrest. He relented only when Officer Higgs pulled out and threatened to use his stun gun. At that point, Mr. Sullivan told Officer Higgs that he had friends who were videotaping the two men. He allowed the officer to place him in handcuffs.

As Officer Higgs gathered up items belonging to himself or Mr. Sullivan that had fallen on the ground during their struggle, Mr. Sullivan apologized to the officer, telling him he had PTSD[3] and that sometimes when he gets pushed, "this type of stuff happens." RP at 286. The two men then proceeded to Officer Higgs's patrol car, where the officer read Mr. Sullivan *Miranda*[4] warnings. On finishing, he asked Mr. Sullivan if he understood his rights, to which Mr. Sullivan said something along the lines of, "[Y]ep, I fucked up, and I'll have to answer for it." RP at 290.

In May 2014, the State charged Mr. Sullivan with third degree assault in violation

---

[3] Post-traumatic stress disorder.

[4] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

of RCW 9A.36.031(1)(g), which applies to assault of a law enforcement officer who is performing his official duties at the time of the assault. At a CrR 3.5 hearing in February 2015, the trial court ruled that statements volunteered by Mr. Sullivan to Officer Higgs before being read *Miranda* warnings were admissible, and that contrary to Mr. Sullivan's denial, he had been read and waived his *Miranda* rights before making additional statements to police.

On March 31, 2015, the State moved to amend the information to add a charge of resisting arrest. The amendment was granted over Mr. Sullivan's objection.

At trial, the State largely relied on Officer Higgs's testimony, on six photographs he claimed to have taken of a handful of "no trespassing" and "restricted area" signs on the afternoon following his arrest of Mr. Sullivan, on surveillance video from two security cameras at the dam, and on the cell phone video taken by Mr. Conant Jr.

Anticipating that Mr. Sullivan's wife and friends would support his version of events, the State also called Mr. Mellick, Mr. Fields, Mr. Conant Sr. and Ms. Tesch adversely. It questioned them about why they had been watching Mr. Sullivan fish on April 24 as part of its theory that Officer Higgs had been set up.

Mr. Sullivan testified on his own behalf, telling jurors he was cooperative with Officer Higgs and it was when he politely asked why the officer was requiring identification that the officer lunged at him, knocked him to the ground, and repeatedly

bashed and ground his head into the sharp rocks. Mr. Mellick, Mr. Fields, and Ms. Tesch supported Mr. Sullivan's version of events.[5]

Mr. Sullivan also relied on the security camera and cell phone videos, including copies that his forensic expert had enhanced to zoom in on the actions of Officer Higgs and Mr. Sullivan. As to the signs Officer Higgs claimed to have photographed on the day of the arrest, Mr. Sullivan denied having seen them, his wife denied having seen any but one of them, and Mr. Mellick and Mr. Fields testified that not all of them were in place on the day of Mr. Sullivan's arrest. Mr. Mellick and Mr. Fields testified that those along the riverbank were only installed later.

Finally, Mr. Sullivan denied ever making a serious apology to Officer Higgs. He testified that Officer Higgs said to him, "[T]his is really stupid, going to jail for a fish," to which he answered, "I'm sorry I made you beat me up." RP at 759. He characterized it as a "smart ass comment" rather than an apology. *Id.*

The jury found Mr. Sullivan guilty as charged. In a special verdict form, it found that Officer Higgs had probable cause to arrest Mr. Sullivan for trespass, obstructing a law enforcement officer, and third degree assault. Mr. Sullivan appeals.

---

[5] Mr. Conant Sr., on the other hand, testified that he saw a struggle between the two men but never saw the officer bash Mr. Sullivan's head into the rocks or punch him.

ANALYSIS

Mr. Sullivan makes 10 assignments of error. We address them in the order presented.

I.     THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY ALLOWING THE STATE TO AMEND THE INFORMATION TO ADD A CHARGE OF RESISTING ARREST

On March 31, 2015, the State moved to amend the information to add a charge of resisting arrest. At the time of the motion, trial was scheduled to begin on April 8, 2015, and the outside date for trial for speedy trial purposes was May 8, 2015. The court allowed the amendment. Mr. Sullivan contends this was error.

CrR 2.1(d) authorizes trial courts to permit amendment of an information "at any time before verdict or finding if substantial rights of the defendant are not prejudiced." A defendant objecting to amendment bears the burden of showing prejudice. *State v. Brown*, 74 Wn.2d 799, 801, 447 P.2d 82 (1968). A defendant who is misled or surprised by an amendment is entitled to move for a continuance if needed to prepare a defense. *Id*. We review a trial court's decision to allow amendment for abuse of discretion. *State v. Guttierrez*, 92 Wn. App. 343, 346, 961 P.2d 974 (1998).

Mr. Sullivan's original charge was for the assault of a police officer performing his official duties. His defense, identified in December 2014, was self-defense and "an arrestee's resistance of excessive force" which he contended was justified. Clerk's

11

No. 33438-4-III (consol. w/ No. 35223-4-III)
*State v. Sullivan*; *In re Pers. Restraint of Sullivan*

Papers (CP) at 11. Under these circumstances, it is hard for him to argue persuasively that an added charge of resisting arrest was surprising and prejudicial.

Mr. Sullivan nonetheless argues that there is an important difference between the two charges, in that the lawfulness of Officer Higgs's arrest was an element of the resisting arrest charge but not the assault charge. Applying the proper analysis of prejudice, the trial court found that the lawfulness of arresting Mr. Sullivan had been close to the core of the parties' preparation of trial for months.

Mr. Sullivan also cites case law holding that a Hobson's choice is presented when a defendant must choose between his right to a speedy trial and his right to be represented by adequately prepared counsel. But at the time of the State's amendment, Mr. Sullivan was over five weeks away from any speedy trial issue. There was ample time for a continuance that would not compromise his speedy trial right. He did not request a continuance, a choice that is "persuasive of lack of surprise and prejudice." *See State v. Gosser*, 33 Wn. App. 428, 435, 656 P.2d 514 (1982). No abuse of discretion is shown.

II.    NO ISSUE IS PRESENTED OF AMENDMENT OF A CHARGE FOLLOWING THE STATE'S CASE IN CHIEF

Mr. Sullivan assigns error to the trial court allegedly allowing the State to amend its information after resting its case in chief. Review of his citation to the record reveals that his complaint has nothing to do with an amended charge.

12

In proceedings outside the hearing of the jury in the defense case, partway through Mr. Sullivan's testimony, the trial court questioned whether Mr. Sullivan was still asserting self-defense, since he had denied striking Officer Higgs in the thigh at all. Defense counsel answered that Mr. Sullivan had admitted pulling the officer's finger, which could constitute an assault. The prosecutor pointed out that the assault on which the State intended to rely was the blow to the officer's thigh. Asked by the trial court whether the State's reliance on only the one blow would change how the jury should be instructed, defense counsel said he would speak with his client. The court said the issue would be addressed the following Monday morning.

That Monday, Mr. Sullivan filed a brief characterizing the State's plan to rely for assault solely on the blow to the thigh as an amendment to the information. He argued it should not be permitted, since Officer Higgs had already testified that during the several moments he struggled with Mr. Sullivan his finger was pulled and the two had wrestled on the ground, both of which would constitute assaults. On appeal, the State explains that it chose to rely solely on the blow to the thigh in order to avoid any argument on appeal that this is a multiple acts case and Mr. Sullivan was deprived of his right to a unanimous jury.

The State's election of a particular assault was reflected in jury instruction 11, the to-convict instruction for assault in the third degree. It identified the first element the State was required to prove as being, "That on or about April 24, 2014, the defendant

13

assaulted Joseph Higgs on the thigh." CP at 322. When the trial court asked the parties for their exceptions to the instructions, Mr. Sullivan did not object to the giving of instruction 11.

The State's tactical decision to avoid a unanimity argument on appeal by relying on a specific act of assault was not an amendment to the information. Since no objection was made in the trial court to instruction 11, it cannot be challenged on appeal. *See* RAP 2.5(a).

III.    MR. SULLIVAN'S CHALLENGE TO THE COURT'S RULING ON HIS HALFTIME MOTION
        WAS NOT PRESERVED, AND ANY ERROR IN REFUSING TO GIVE MR. SULLIVAN'S
        PROPOSED JURY INSTRUCTION 18 WAS HARMLESS

Mr. Sullivan argues the trial court erred by failing to grant a motion to dismiss the resisting arrest charge that he made after the State rested. The court took the motion under advisement, and Mr. Sullivan proceeded by putting on further evidence. RP at 684. He does not identify in his briefing when, in the record, the trial court ruled on the motion. In any event, we do not review this assignment of error because Mr. Sullivan waived a challenge to the sufficiency of the State's case by continuing to put on evidence on his own behalf. *E.g.*, *State v. Hobart*, 34 Wn. App. 187, 659 P.2d 557 (1983). At this point, he is only entitled to challenge the sufficiency of the evidence as a whole, which is not the error he has assigned.[6]

---

[6] To head off a motion for reconsideration, we point out a fallacy in Mr. Sullivan's characterization of the evidence. Mr. Sullivan argues that we should disregard the

Mr. Sullivan also argues that the trial court erred in refusing to give his proposed jury instruction 18, which states, "Defendant cannot be arrested for obstructing a law enforcement officer by refusing to give law enforcement his identification." CP at 174. He cited a number of reported decisions for the nonpattern instruction; on appeal, he places principal reliance on *State v. Williams*, 171 Wn.2d 474, 251 P.3d 877 (2011).

Although Mr. Sullivan was not charged with obstructing, Officer Higgs testified that he believed Mr. Sullivan's refusal to provide identification constituted obstructing and provided one of several grounds for arrest. In light of that testimony, it was possible that the jury might rely on obstructing as the basis for the "lawful arrest" element of resisting arrest. A trial court would abuse its discretion if it refused to specifically instruct on a theory of defense that would prevent the instructions as a whole from

---

probable cause to believe criminal trespass had occurred because Officer Higgs "testified that he was not going to arrest Mr. Sullivan for trespassing and only arrested him for obstructing an officer after Mr. Sullivan refused to produce his identification." Br. of Appellant at 17. The false implication is that Officer Higgs did not believe that the criminal trespass provided a basis for arrest.

The officer knew the trespass provided a basis for arrest. His testimony is clear that he knew he could arrest for the trespass but did not intend to if, as he reasonably expected, Mr. Sullivan provided his name, accepted a trespass warning, and left. When he did not, Mr. Sullivan's refusal to provide identification became the reason for proceeding to plan B: placing Mr. Sullivan under arrest. As the officer explained, "I couldn't give him a trespass warning without knowing who he was." RP at 355. In the officer's view, "[A]t that point he was trespassing *and* he was obstructing." *Id.* (emphasis added). Elsewhere, he testified, "I informed him he was under arrest for *trespassing and obstruction* and I reached forward to take control of his right arm." RP at 258 (emphasis added). Trespass alone provided a lawful basis for arrest.

15

correctly apprising the jury of the law or prevent the defendant from arguing his defense theory. *State v. Ayala Ponce*, 166 Wn. App. 409, 419, 269 P.3d 408 (2012) (citing *State v. Rice*, 102 Wn.2d 120, 123, 683 P.2d 199 (1984)).

The trial court refused to give Mr. Sullivan's proposed jury instruction 18, questioning whether the case law on which Mr. Sullivan relied—case law largely involving *Terry*[7] stops—applied here, where Officer Higgs had probable cause to place Mr. Sullivan under arrest and needed his identification to prepare a trespass warrant and police report. That might be a reasonable distinction, given that a principal concern of the Supreme Court in *Williams* was to prevent police officers from demanding information without probable cause or even reasonable suspicion that a crime is being committed. *Williams*, 171 Wn.2d at 485-86.[8] And there has been no challenge to the statutory duty under RCW 46.61.021(3) to provide identification when stopped for a traffic infraction. On the other hand, in *Williams* there was probable cause to charge the defendant with first degree theft in addition to the charge of obstructing a law

---

[7] *Terry v. Ohio*, 392 U.S. 1, 16-19, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

[8] The Court explained in *Williams* that it had required conduct in addition to pure speech to establish obstruction of an officer in significant part "because of . . . concerns that law enforcement officers, without probable cause or even reasonable suspicion that a crime is being committed, may engage citizens in conversation, arrest them for obstruction based upon false statements, and then search incident to the arrest. As we said in [*State v.*] *White* of the stop and identify statute, such statutes cannot be used to make an 'end run' around constitutional limitations on searches and seizures. [*See*] *White*, 97 Wn.2d [92, ]106-07[, 640 P.2d 1061 (1982)]." *Williams*, 171 Wn.2d at 485-86.

enforcement officer for providing a false name, yet the obstruction charge was still reversed by the Supreme Court.

We need not decide whether the distinction made by the trial court applies, because any error was harmless in light of the jury's special verdict finding that Officer Higgs "ha[d] probable cause to arrest defendant for criminal trespass in the second degree" and "ha[d] probable cause to arrest defendant for assault in the third degree." CP at 339. Mr. Sullivan's criminal trespass and third degree assault both satisfied the "lawful arrest" element of the resisting arrest charge. The State proposed special verdict form A in order to establish jury unanimity on a valid basis for finding a "lawful arrest," and in light of this assignment of error, the special verdict served its purpose.[9]

IV.     THE TRIAL COURT DID NOT ERR BY USING A SPECIAL VERDICT FORM IN AN EFFORT TO AVOID A UNANIMITY ISSUE ON APPEAL

The prior discussion largely answers Mr. Sullivan's next assignment of error, which is that the trial court erred by giving the jury special verdict form A, in order to determine which of Officer Higgs's reasons for arresting Mr. Sullivan the jurors unanimously found to be supported by probable cause. Mr. Sullivan argues that the instruction "confused the jury," leading jurors to feel "that they were asked to find Mr.

---

[9] *See* CP at 396 ("[T]he special interrogatory in this case was offered for appellate purposes in case one of the underlying crimes to the resisting arrest is reversed for insufficiency. If, for example, the court of appeals rules as a matter of law that defendant did not have to provide his identification to Officer Higgs.").

Sullivan guilty of trespass and obstructing an officer." Br. of Appellant at 19. No

citation to the trial record is provided for this claim of jury confusion.[10] The jurors posed

no questions to the court during their deliberations and they returned their verdict in short

order: the court's instructions and the exhibits were delivered to the jurors to begin their

deliberations at 4:30 p.m. on April 20, 2015, and counsel was notified that the jury had

reached a verdict at 10:30 a.m. the next morning. No error is shown.

V.     MR. SULLIVAN'S CONTENTION THAT EVIDENCE WAS IMPROPERLY ADMITTED
       UNDER ER 404(b) IS INADEQUATELY BRIEFED AND ANY ERROR WAS NOT
       PRESERVED

Mr. Sullivan argues that the trial court improperly allowed the "bad acts and

opinions" of Mr. Mellick, Mr. Fields, and others to be admitted without conducting the

balancing required by ER 404(b). Br. of Appellant at 20. ER 404(b) provides that

"[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a

person in order to show action in conformity therewith." Such evidence may be

admissible for other purposes, *see id.*, but in light of the potential for prejudice and juror

misuse of the evidence, a trial court must make several findings before admitting the

---

[10] In support of a posttrial motion, Mr. Sullivan submitted a declaration of his lawyer that contains hearsay he attributes to one of the jurors following the trial. Not only is it inadmissible hearsay, but its substance, even if it had been attested to by the juror himself, inheres in the verdict. "The individual or collective thought processes leading to a verdict 'inhere in the verdict' and cannot be used to impeach a jury verdict." *Richards v. Overlake Hosp. Med. Ctr.*, 59 Wn. App. 266, 272, 796 P.2d 737 (1990) (quoting *State v. Ng*, 110 Wn.2d 32, 43, 750 P.2d 632 (1988)). We will not consider the hearsay attributed to the juror.

evidence for a permitted purpose.  *See, e.g.*, *State v. Vy Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002) (identifying findings required).

The State responds that Mr. Sullivan has failed to support his claims of error with citation to the evidence or rulings he is complaining about, in violation of RAP 10.3(a)(5) and (6).  Its point is well-taken.[11]  The shortcoming presents more than a rule violation, because "[a]n evidentiary error, such as erroneous admission of ER 404(b) evidence, is not of constitutional magnitude" and cannot be raised for the first time on appeal.  *State v. Powell*, 166 Wn.2d 73, 84, 206 P.3d 321 (2009) (citing *State v. Everybodytalksabout*, 145 Wn.2d 456, 468-69, 39 P.3d 294 (2002), *rev'd on other grounds*, 161 Wn.2d 702, 166 P.3d 693 (2007)); RAP 2.5(a).  Without an identification of the specific evidence Mr. Sullivan is challenging and a record citation to the objection he raised in the trial court, we cannot determine whether an objection was even made or, if one was made, whether it was clear enough to preserve the error.  *Powell*, 166 Wn.2d at 87 (Stephens, J., concurring) (review is allowed where the basis for an objection, although not specifically stated, is readily apparent from the circumstances).

---

[11] Instead of pointing this court to specific evidence, Mr. Sullivan's brief includes general complaints followed by long string citations: "(Vol 2, RP 279, 389, 435-439, 443, 446, 448, 450-456, 459-461, 465-66, 480, 484, 491-492, 501-507, 509-518, 538; Vol 4 RP 943) . . . (Vol 1, RP 26-42) . . ." and "(Vol 2, RP 404, 435, 446-447, 461, 484, 496, 503) (Also See Hrg. 3/31/15, RP 25)."  Br. of Appellant at 20.

Given the violation of the rules on appeal, we will consider whether the trial court erred in ruling on the admissibility of only a few "bad acts" that we recognize the State wished to explore. The first was Mr. Fields's admission that he had been involved in a fight with a Grand Coulee police officer roughly 10 years before Mr. Sullivan's trial. The State anticipated asking him about it. The trial court told the prosecutor that it was concerned about admissibility and that it was "going to take this on a question-by-question basis." RP at 461. The prosecutor ultimately decided not to question Mr. Fields about the fight. He did not attempt to present any other evidence of the incident.

The second was Mr. Mellick's trespass violation and arrest three days before Mr. Sullivan's arrest. It was the subject matter of extensive discussion in the trial court because Mr. Mellick received a deferred sentence that had not yet been dismissed, and the State was required to grant him transactional immunity as a condition to questioning him about it. Mr. Mellick's defense attorney in the pending trespass prosecution was present for an extensive offer of proof outside the presence of the jury in order to establish the terms of the immunity and explore some pending administrative proceedings between Mr. Mellick and BOR.

At the conclusion of the offer of proof, the trial court announced limited matters it believed were relevant and that it would allow the State to explore. While Mr. Sullivan raised an additional limit he thought should be imposed (with which the court did not disagree), he made no objection to the court's ruling. When the prosecutor questioned

20

Mr. Mellick before the jury about the matters, Mr. Sullivan made no objection. Any

objection Mr. Sullivan had was not preserved.

VI.   THE TRIAL COURT DID NOT ERR IN DENYING MR. SULLIVAN'S POSTTRIAL MOTIONS
      TO DISMISS THE CHARGES FOR GOVERNMENTAL MISCONDUCT

In posttrial motions, Mr. Sullivan included a motion to dismiss the charges against

him under CrR 8.3(b), for governmental misconduct. In order to succeed on a CrR 8.3(b)

motion to dismiss, the defendant must prove both governmental misconduct and

prejudice to his right to a fair trial by a preponderance of the evidence. *State v. Rohrich*,

149 Wn.2d 647, 654, 71 P.3d 638 (2003).

Mr. Sullivan argued that the prosecutor had "stated to the juror and in an email . . .

that he basically only pursued these charges in order to prevent a civil suit filed by Mr.

Sullivan." CP at 358. His evidence in support of the motion consisted of electronic mail

from prosecutor Kiel Willmore to Mr. Sullivan's lawyer, and Mr. Sullivan's lawyer's

declaration as to a statement allegedly made by Mr. Willmore to a juror following trial.

The electronic mail from Mr. Willmore was dated March 27, 2015, and addressed

pending trial preparation issues between the two lawyers. It ended with the following

paragraph:

> On a side note, I need to research some case law about the propriety of
> dismissing a case with an agreement by the defense that they won't pursue
> a civil claim against another party. You told me that your client was not
> going to press a civil suit. You said that, however, with a little uncertainty
> in your voice. Perhaps the best thing to do with this case is dismiss it with

> an agreement no suits will be filed from Mr. Sullivan against any of the
> other parties involved.

CP at 366.

A declaration of deputy prosecutor Willmore filed in response stated in relevant

part that Mr. Sullivan's lawyer visited his office before trial "and asked whether the State

would be willing to dismiss the case with an oral promise (by him) that his client was not

going to file a civil complaint against the Grand Coulee Police Department." CP at 419.

The declaration stated the prosecutor rejected that offer. It acknowledged that he later

sent the March 27 e-mail, and explained what happened thereafter:

> I subsequently researched the case authority on this issue and decided not to
> move forward with such an agreement. I discovered that release-dismissals
> are permitted but frowned upon by reviewing courts.
>
> . . . I never formally offered defendant a release-dismissal and there was
> never a counteroffer to my non-offer.

CP at 419. Mr. Willmore disputed all of Mr. Sullivan's lawyer's allegations about

posttrial statements between himself and a juror, as "incomplete, out of context, and/or

incorrect interpretations of what was said." CP at 420.

At the hearing on Mr. Sullivan's posttrial motions the trial court heard argument,

and having reviewed the record, ruled:

> I think if—certainly if Mr. Willmore had threatened Mr. Sullivan with
> criminal charges in order to get him to waive any right to civil damages for
> violation of his constitutional rights, that would be wrong. I suspect that if
> Mr. Willmore had proposed a resolution or proposed to dismiss the charge
> in exchange for the same thing, that there might be some problems with
> that, too. But I don't think that's what happened in this case. I read the e-

22

mails that counsel has cited and Mr. Willmore, I think at one point says,
you know, in a perfect world, maybe the best thing would be if this all went
away. But he specifically said in the letter, you know, I'm concerned about
the—about the ethical implications of doing that, and he never makes that
offer, he never makes that offer to Mr. Sullivan. I think the record is very
clear that Mr. Willmore did not engage in misconduct in that way.

RP at 1104-05.

We will overturn the denial of a CrR 8.3(b) motion to dismiss if the trial court's

decision was manifestly unreasonable or based on untenable grounds. *State v. Wilson*,

149 Wn.2d 1, 9, 65 P.3d 657 (2003). The trial court's ruling was reasonable and based

on tenable grounds.

VII.    MR. SULLIVAN DOES NOT DEMONSTRATE THAT THE STATE WITHHELD THE "BEST
        QUALITY" VIDEO IN VIOLATION OF HIS DUE PROCESS RIGHTS

Mr. Sullivan argued at least twice in proceedings below that the State was

violating or had violated his right to due process under *Brady v. Maryland*, 373 U.S. 83,

83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), by failing to provide the defense with better

quality video from the BOR security cameras.[12] He raised it in a pretrial "Motion to

Interview USBR Employees and Discovery of USBR Surveillance Videos," CP at 68,

and in his posttrial motions for a new trail and arrest of judgment.

---

[12] A second argument—that the State withheld a BOR work order—cannot
effectively be advanced on direct appeal because the evidence on which Mr. Sullivan
relies is not supplemental evidence that can be added to the record under RAP 9.11. We
deal with that issue in Mr. Sullivan's consolidated personal restraint petition, addressed
below.

Under *Brady*, the prosecution has an affirmative duty to disclose evidence that is favorable to a defendant. *Brady*, 373 U.S. at 87; *Kyles v. Whitley*, 514 U.S. 419, 432, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). "In order to establish a *Brady* violation, a defendant must establish three things: (1) '[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching,' (2) 'th[e] evidence must have been suppressed by the State, either willfully or inadvertently,' and (3) the evidence must be material." *State v. Davila*, 184 Wn.2d 55, 69, 357 P.3d 636 (2015) (alterations in original) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999)).

"Evidence is material under *Brady* 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Davila*, 184 Wn.2d at 73 (internal quotation marks omitted) (quoting *Kyles*, 514 U.S. at 433-34. The defense has the burden to produce facts in support of its theory of materiality; evidence of things that *might* have occurred is speculative for purposes of the materiality inquiry. *Id.* at 81-82.

If the means of obtaining the evidence is provided to the defense and with reasonable diligence the defendant could have obtained it, there is no suppression and hence no *Brady* violation. *State v. Mullen*, 171 Wn.2d 881, 896, 259 P.3d 158 (2011).

In Mr. Sullivan's discovery motion filed over two weeks before the scheduled trial date and over three weeks before trial actually began, he admitted he had been provided

24

by the prosecutor with "several DVDs containing a reproduction of a surveillance video recording of the incident at issue in this case" but stated that Mr. Sullivan believed the DVD's poor quality reproduction "of such high level Homeland Security system is suspect and withholds favorable . . . evidence." CP at 71-72. He also represented that his forensic expert believed that detail had been lost in the process of making the DVD copies because of the compression of the video to a small file size. He sought the opportunity to depose BOR personnel to determine whether a better copy was available.

At the March 31 hearing on the motion, the prosecutor explained that he had provided all the video he had obtained from the BOR. He stated that Mr. Sullivan could press the issue with BOR but there was nothing further the State could do.

An additional key concern of Mr. Sullivan at the March 31 hearing was whether he would be able to lay a foundation for the video he *had* been provided, because BOR was not cooperating. The trial court gave Mr. Sullivan the choice of a continuance, affording him more time to compel BOR's production of the witnesses or further video, but Mr. Sullivan did not want a continuance. When the State agreed to a manner for ensuring admission of the video Mr. Sullivan had already been provided, his counsel agreed that the assurance that he could admit the video was a sufficient resolution of his motion.

The court's order entered at the conclusion of the hearing, signed by both counsel, stated:

25

> IT IS ORDERED that: the (4) four videos given to the defense by Officer Higgs and the prosecution shall be admitted at trial during officer's testimony that he was present in the videos and the videos represent the 4-24-14 incident. The defense shall contact Tyler Mellick, Patricia Conant and Robert Fields for a prosecution interview before trial.*
>
> *The State's motion to continue trial is denied. The remainder of defense 3-31-15 discovery motion withdrawn.

CP at 86.

During trial, defense counsel argued to jurors in closing that the poor quality of the video made it suspect, from which they should infer that Mr. Sullivan was telling the truth about what happened.

In his posttrial motions, Mr. Sullivan reprised the complaints about the video made in the pretrial discovery motion. The declaration of counsel in support of the motion repeated Mr. Sullivan's belief that the poor reproduction was suspect and that favorable evidence was being withheld. In support of the posttrial motion, he also filed a declaration from his forensic expert, but the expert could only speculate about why the quality of the videos was poor and why he suspected that the original might contain more detail. The expert understandably could not speak at all to whether any better quality video would be exculpatory or inculpatory.

Having considered the parties' submissions and the argument of counsel, the trial court denied Mr. Sullivan's motion for a new trial based on the asserted *Brady* violation, stating,

> I went back and looked at the file and the difficulties that the parties had in getting all these additional tapes from the Bureau, the prosecution I think was very diligent in seeking to find all of this evidence, and if there was a problem with these videos we got from the Bureau, the problem is with the Bureau.

RP at 1105.

In reviewing the trial court's decision on the posttrial *Brady* motion, "the trial court's legal conclusions about materiality are reviewed de novo, but its underlying factual findings are reviewed for substantial evidence in the record." *Davila*, 184 Wn.2d at 74-75. The trial court's finding that the second "withholding" requirement for a *Brady* violation was not met is supported by substantial evidence. Mr. Sullivan's decision to refuse the trial court's offer of a trial continuance in order to obtain discovery from the BOR is a further basis for finding no suppression.

While not addressed by the trial court, Mr. Sullivan fails to demonstrate the first or third elements of a *Brady* violation, either. He does not show that better video, if any exists, would be favorable to him. Because he can only speculate about what might be available, he does not establish materiality.

VIII. MR. SULLIVAN DOES NOT DEMONSTRATE PROSECUTORIAL MISCONDUCT

Mr. Sullivan contends the prosecutor committed misconduct in numerous ways during trial. A defendant claiming prosecutorial misconduct bears the burden of proving the prosecutor's conduct was both improper and prejudicial in the context of the entire

record and the circumstances at trial. *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008).

The instances of prosecutorial misconduct alleged by Mr. Sullivan are that the prosecutor (1) expressed his personal opinion of the evidence, (2) argued prior bad acts of witnesses, (3) argued from a late amendment to the information, (4) took unfair advantage of the low quality videos, (5) argued conspiracy, (6) mocked Mr. Sullivan in a demeaning tone of voice, and (7) stated to jurors, during Mr. Sullivan's testimony, that Mr. Sullivan was closing his right fist. In almost every case, these contentions are stated conclusorily, without identifying the statements about which Mr. Sullivan is complaining. We are only able to discern the first, sixth and seventh statements that Mr. Sullivan claims constitute misconduct. We will not consider the other contentions further.

Mr. Sullivan's first charge focuses on the prosecutor's use of the words, "I don't think" during closing argument, as expressing his personal opinion. The prosecutor argued as follows:

> *I don't think* the defendant when he went down there intended to assault Officer Higgs. But that was the result. *I don't think* he went down there thinking, I'm going to get in a fight with an officer today. At least not a physical one. But he did intend to engage Officer Higgs in a confrontation.

RP at 998-99 (emphasis added). The "I don't think" statements are reasonably understood as expressing the prosecutor's opinion. But Mr. Sullivan does not explain how they are prejudicial. They appear neutral, or perhaps even helpful to the defense.

28

Importantly, Mr. Sullivan objected to the prosecutor's statements, with the following result:

> [DEFENSE COUNSEL]:  Your Honor, I would object to personal opinions.  "I think."
> [PROSECUTOR]:  I didn't—I'm characterizing the defendant thinking that, not me thinking that the defendant thought that.
> THE COURT:  Okay.  Thank you for clarifying.

CP at 999.  The jurors presumably accepted the prosecutor's clarification.  The defense did not object further.  As clarified, the prosecutor was not stating a personal opinion.  If jurors still harbored the impression that he had expressed a personal opinion, it is not shown to be prejudicial.

The next discernible statement Mr. Sullivan alleges constitutes prosecutorial misconduct is the prosecutor's alleged use of a demeaning tone in his rebuttal closing argument.  The following argument is at issue:

> [PROSECUTOR]: Please do note that the defendant left his remaining nine lures back in his truck.  You saw how long it took Officer Higgs to walk that hundred yards or so to get to the defendant.  It takes some time.  And the defendant, he knows he's going to be losing lures.  And he just leaves the remaining nine back at his truck?  Again, more evidence that he was just waiting for Officer Higgs to show up.  Just waiting for that confrontation so that he could show he had a right, I've got a right, this is my right, I've got my buddies videotaping this.  Officer Higgs testified to that.  When he finally got the defendant on his knees, and they were wrestling around there, the defendant says, you'd better be careful, I've got two of my guys videotaping this.
> [DEFENSE COUNSEL]:  Your Honor, I'd object the way he's stressing and how vulgar type of language he's using and also the way he's describing it to the jury.  He doesn't have to be demeaning.
> THE COURT:  But he has latitude in arguing the case, [counsel].

29

> [DEFENSE COUNSEL]: He doesn't have to talk like that, Judge.
> THE COURT: Well, I'm not going to sustain—
> [DEFENSE COUNSEL]: He acts like Mr. Sullivan talks like that, he doesn't.
> THE COURT: At this point, the objection is overruled. Please continue.
> [PROSECUTOR]: Thank you, your Honor.

RP at 1038-39.

Mr. Sullivan raised the same charge of the prosecutor mocking Mr. Sullivan in his posttrial motions. At the hearing on those motions, the trial court rejected the alleged mocking as a basis for relief, ruling, "The rebuttal, I am sorry, I was there, I don't recall the tone that you've asserted here . . . so I'm not going to find that there was improper argument on rebuttal either." RP at 1106.

The trial court did not find the prosecutor's tone improper in overruling defense counsel's objection at trial. It affirmed approximately six weeks later that it recalled no objectionable tone. Mr. Sullivan presents no audio recording or any other reason for us to reject the trial court's assessment of the prosecutor's tone.

Lastly, Mr. Sullivan argues it was misconduct for the prosecutor to state for the record during cross-examination that Mr. Sullivan closed his right fist during his testimony. One of Mr. Sullivan's theories of defense was that Mr. Sullivan's arthritis prevented him from making a fist with his right hand and Officer Higgs therefore must be lying when accusing him of striking him with his fist. During Mr. Sullivan's cross-examination, the following exchange took place:

> [PROSECUTOR]  What's a hip throw?
>
> [MR. SULLIVAN]  Well, basically if you're in close, you can throw them with your hip, or you can come up underneath, grab a jacket here, grab a hand here.
>
> [PROSECUTOR]  Stop right there.  Stop right there.  For the record, your Honor, the defendant is closing—
>
> [MR. SULLIVAN]  No.
>
> [PROSECUTOR]  —his right fist.
>
> [MR. SULLIVAN]  Take a look.  It's not a fist.  This hand is here.  I want to state that.  A fist is here.
>
> [PROSECUTOR]  Your Honor—Mr. Sullivan, I get to ask the questions for you.  All right?
>
> [MR. SULLIVAN]  I'm just saying, you're saying it's a fist.
>
> THE COURT: The record will reflect that Mr. Sullivan has made a demonstration involving his arms and his hands.  The jury has seen—has seen it.
>
> [PROSECUTOR]  Okay.
>
> THE COURT: Let's leave it at that.

RP at 855-56.  Mr. Sullivan's attorney did not object.  Instead, on redirect, he had Mr. Sullivan further demonstrate to the jury the extent to which he could, and could not, close his fingers.

Shortly thereafter, and outside the presence of the jury, the trial court stated, "I did not want to say this in front of the jury, but it appeared to me that Mr. Sullivan both yesterday and today in demonstrating what had happened on the banks of the river on the 24th appeared to make what appeared to be a closed fist, he was closing his fingers down over his hands."  RP at 859.  Rather than object, defense counsel said, "I'm glad we got that straightened out, Judge.  The differences."  RP at 860.

31

Where no objection is made to a prosecutor's statements during trial, the defendant is deemed to have waived any error unless the prosecutor's misconduct "'is so flagrant and ill-intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by a curative instruction to the jury.'" *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006) (quoting *State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997)).

Here, the prosecutor merely stated for the record something he believed the witness had done with his right hand while testifying—something that, if jurors saw it and agreed, they were entitled to consider. Without agreeing with the prosecutor's characterization, the trial court properly stated, "The record will reflect that Mr. Sullivan has made a demonstration involving his arms and his hands. The jury has seen—has seen it." RP at 855. It later instructed jurors, "It is important . . . for you to remember that the lawyers' statements are not evidence." CP at 311. No flagrant or ill-intentioned conduct is shown.

IX.    MR. SULLIVAN'S ALLEGATION THAT THE TRIAL COURT COMMENTED ON THE EVIDENCE IS INADEQUATELY BRIEFED AND WILL NOT BE CONSIDERED

Mr. Sullivan accuses the trial court of commenting on the evidence. Article IV, section 16 of the Washington Constitution provides: "Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." "The purpose of this provision is to prevent a jury from being influenced by knowledge conveyed to it

by the trial judge as to the trial judge's opinion of the evidence submitted." *State v. Swan*, 114 Wn.2d 613, 657, 790 P.2d 610 (1990). A trial court improperly comments on the evidence if it effectively removes "a disputed issue of fact from the jury's consideration." *State v. Becker*, 132 Wn.2d 54, 65, 935 P.2d 1321 (1997). A challenge to a court's comment on the evidence is a manifest constitutional error that can be raised for the first time on appeal. RAP 2.5(a)(3); *State v. Levy*, 156 Wn.2d 709, 719-20, 132 P.3d 1076 (2006).

Citing 14 pages of the trial record, Mr. Sullivan conclusorily argues that the trial court commented on the evidence. He does not identify the particular trial court statement on which he relies or argue how the statement removed a disputed fact from the jury's consideration.

RAP 10.3(a)(6) requires a brief on appeal to contain "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record." Our assiduous law clerk has reviewed each of the 14 pages cited by Mr. Sullivan's brief and found some that reflect only dialogue outside the presence of the jury, others that reflect the trial court reminding witnesses to answer the question asked, some that merely reflect rulings on objections, and one that contains no statement by the trial court at all. The panel refuses to sift through a string citation of pages to guess at which statement Mr. Sullivan had in mind and why he found it

objectionable. Given the violation of RAP 10.3(a)(6), we will not consider this assignment of error further.

X.     THE TRIAL COURT DID NOT ERR IN DENYING MR. SULLIVAN'S MOTION TO SUPPRESS HIS STATEMENTS MADE PRIOR TO RECEIVING *MIRANDA* WARNINGS

Finally, Mr. Sullivan contends the trial court should have suppressed his statements of apology that Officer Higgs said were volunteered before he read *Miranda* warnings to Mr. Sullivan. Mr. Sullivan does not assign error to the finding that he waived his *Miranda* rights and made voluntary statements thereafter.

At the CrR 3.5 hearing, Mr. Sullivan argued that Officer Higgs's statement to him about it being stupid to go to jail over a fish was calculated to elicit an incriminating response, in violation of a defendant's right to remain silent.

A suspect who is in custody but who is not being "interrogated" does not have *Miranda* rights. *State v. Warness*, 77 Wn. App. 636, 639-40, 893 P.2d 665 (1995). "Interrogation" is broad enough to include express questioning and its functional equivalent, which the United States Supreme Court has defined as "'any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *State v. Wilson*, 144 Wn. App. 166, 184, 181 P.3d 887 (2008) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980)). "[T]he burden is upon the State to demonstrate . . . that such a statement was 'volunteered' in the *Miranda* sense, *i.e.*, that it was spontaneous and not

prompted by questioning or other action calculated to elicit response." *State v. Boggs*, 16 Wn. App. 682, 685-86, 559 P.2d 11 (1977).

Whether an officer is engaged in "interrogation" for *Miranda* purposes is a mixed question of law and fact. *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 680-81, 327 P.3d 660 (2014) (citing *United States v. Poole*, 794 F.2d 462, 465 (9th Cir.1986)). We defer to the trial court's findings of fact but review conclusions from those findings de novo. *Id.* at 681.

The trial court entered written findings of fact and conclusions of law following the suppression hearing. Mr. Sullivan does not assign error to any of what the trial court designated as its findings of fact, which are verities on appeal. *State v. Daniels*, 160 Wn.2d 256, 261, 156 P.3d 905 (2007). Among them are findings that:

> 2.6 After gaining control of the situation and placing defendant in handcuffs, defendant repeatedly apologized for his actions and denied medical treatment. Officer Higgs stated that defendant was being stupid and was going to jail over fish.
>
> 2.7 Officer Higgs transported defendant to his vehicle where the officer read defendant his *Miranda* rights and asked if defendant understood them. Defendant responded, "I fucked up. I shouldn't have done that."
>
> . . . .
>
> 2.11 At the police department, and still in custody, defendant repeatedly apologized for the incident and stated that he "starts to lose it" when he gets cornered.

CP at 428.

35

Mr. Sullivan *does* assign error to a conclusion of law that he contends is a finding of fact: the court's conclusion 4.3,[13] that "[b]y stating defendant was stupid for going to jail over fish, Officer Higgs did not intend, nor did defendant understand them [sic] to be, an attempt to elicit an incriminating response in violation of defendant's right to remain silent." CP at 429. We treat a finding of fact mislabeled as a conclusion of law as a finding of fact. *Willener v. Sweeting*, 107 Wn.2d 388, 394, 730 P.2d 45 (1986). The "substantial evidence" that must support a court's findings of fact is "evidence sufficient to persuade a fair-minded, rational person of their truth." *State v. Cherry*, 191 Wn. App. 456, 464, 362 P.3d 313 (2015) (citing *Levy*, 156 Wn.2d at 733).

The evidence we review includes the fact found by the court, undisputed on appeal, that Mr. Sullivan did not make a single sentence response to Officer Higgs but instead, "repeatedly apologized for his actions." CP at 428. Repeated apology is not a response that would be expected from the officer's comment; to apologize was even nonresponsive. The officer's statement was about the criminal charges and incarceration to which Mr. Sullivan had exposed himself. The repeated apologies that the trial court found had been made expressed remorse about the struggle with the officer before the arrest. We conclude that the evidence was sufficient to persuade a fair-minded, rational

---

[13] Mr. Sullivan mistakenly cites to this conclusion in its draft form, differently-numbered in a set of proposed findings and conclusions. Br. of Appellant at 47 (citing CP at 425).

person that Officer Higgs did not intend, nor did Mr. Sullivan understand, the fish

comment as an attempt to elicit the repeated apologies that followed it.

Moreover, even if the trial court's suppression decision were in error, the

volunteered statements made by Mr. Sullivan were harmless beyond a reasonable doubt.

*See Cross*, 180 Wn.2d at 681 (noting application of the constitutional harmless error

standard).  It is a verity on appeal that after being read and waiving his *Miranda* rights,

Mr. Sullivan said, "I fucked up.  I shouldn't have done that."  CP at 428.  It is a verity on

appeal that he thereafter made further repeated apologies, and told Officer Higgs that he

"'starts to lose it'" when he gets cornered.  *Id.*  The fact that he volunteered the same

type of apologies before being read his *Miranda* rights was merely cumulative of Mr.

Sullivan's later, indisputably admissible statements.

The judgment is affirmed.

PERSONAL RESTRAINT PETITION

In a consolidated personal restraint petition (PRP) filed while the appeal was

pending, Joseph Sullivan seeks relief from personal restraint in the form of the disability

resulting from his convictions for resisting arrest and third degree assault.  *See In re Pers.*

*Restraint of Martinez*, 171 Wn.2d 354, 363-64, 256 P.3d 277 (2011) (a conviction fully

served can impose a "disability" in terms of future consequences).  Although not a model

of clarity, his petition appears to contend that his due process rights were violated by the

State's withholding of material exculpatory evidence in the form of work orders for

signage at Grand Coulee dam—work orders that Mr. Sullivan obtained following trial.

He appears to further contend that the work orders constitute newly-discovered evidence

that entitle him to a new trial. He asks us to remand to superior court for a reference

hearing at which additional evidence may be taken.

The factual and procedural background of the convictions is generally recounted

above. Mr. Sullivan's petition arises from a dispute over what signs were in place on the

date of Mr. Sullivan's arrest that provided notice of restricted access to the area on the

Columbia River shoreline where Mr. Sullivan was fishing.

The extent of the signage was in dispute pretrial and at trial. In a pretrial

discovery motion, Mr. Sullivan complained that he had been unable to interview BOR

employees about where, in the vicinity of the approach and area of his arrest, signs were

posted on the day of his arrest. He ultimately withdrew his request for an order

compelling discovery of the sign information when the trial court stated that any order

compelling the discovery requested would require a trial continuance.

At trial, the arresting officer, Joe Higgs, testified to the location of six signs he

claims to have photographed on the afternoon of the arrest. As Mr. Sullivan's PRP

acknowledges, "Mr. Sullivan and many others testified that those signs were not placed at

the locations until after the April 24, 2014 incident." PRP at 3.[14] All told, at least eight

---

[14] Mr. Sullivan's petition is not page-numbered. We refer to the third page of textual material, excluding the cover page.

witnesses testified about which signs they saw on April 24, 2014, or believed were in place on that date. *See* RP at 253-54 (Higgs); RP at 220-21 (BOR security response force operator Cullen Roland); RP at 228 (BOR security response force operator Corey Anderson); RP at 542-49 (Tyler Mellick); RP at 465, 468-69, 472-75 (Robert Fields); RP at 568-69, 572 (Daniel Conant Sr.); RP at 577-78 (Kathy Tesch); and RP at 738-39 (Joseph Sullivan).

Mr. Sullivan also sought at trial to offer testimony from his investigator about her observations of sign removal, placement, and replacement *following* his arrest, telling the court that her testimony would establish that "[t]hey're changing signs all the time." RP at 665. In an offer of proof, the investigator admitted she had no personal knowledge of the signage in place on April 24, 2014. The court excluded her testimony about later sign placement and replacement.

Mr. Sullivan's petition presents a federal Freedom of Information Act (FOIA)[15] request that his investigator made to the BOR on September 9, 2014, well before trial, and a BOR work order that was produced in response, following trial. The investigator made the following request:

> Could you please tell me the procedure to request work orders for signage
> that was put up on the West bank below Grand Coulee?

---

[15] 5 U.S.C. § 552.

These signs were put up to designate off limits fishing area's [sic].
The dates I am looking for are between April 1, 2014 thru July 30, 2014.

PRP App. at A-3. The request was initially denied because the work order was in

progress and would not be prepared until complete. The investigator appealed, and the

final work order was produced thereafter, on July 31, 2015.

The work order is dated April 30, 2014, and is entitled "Left Bank Fishing

Access - Purchase and Install Signs for Park Fence & Left Bank." PRP App. at A-1

(some capitalization omitted). It states that it was completed on February 5, 2015. *Id.*

The sequence of work described is to "purchase or make signs;" "install signs along park

fence" with a reference to Lower VAC Park; and "install signs along left bank below

Lower VAC Park," with a reference to installing "No access beyond this point signs"

every 50 feet if possible. PRP App. at A-1 (some capitalization omitted). The target start

and finish dates are April 30, 2014 and May 29, 2014, respectively. *Id.*

Mr. Sullivan initially and unsuccessfully sought to supplement the record on

appeal with these FOIA documents. After his motion was denied by this court and the

Washington Supreme Court, Mr. Sullivan timely filed this PRP.

<u>Analysis</u>

The bar facing a personal restraint petitioner is high, and overcoming it is

necessary before we will disturb a settled judgment. *In re Pers. Restraint of Fero*, 190

Wn.2d 1, 14-15, 409 P.3d 214 (2018). To obtain relief through a PRP, a petitioner must

40

show actual and substantial prejudice resulting from alleged constitutional errors, or for alleged nonconstitutional errors a fundamental defect that inherently results in a miscarriage of justice. *In re Pers. Restraint of Cook*, 114 Wn.2d 802, 813, 792 P.2d 506 (1990). To avoid dismissal, the petition must be supported by facts and not merely bald or conclusory allegations. *Id.* at 813-14; *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992). A "petitioner must demonstrate that he has competent, admissible evidence to establish the facts that entitle him to relief." *Id.* As earlier noted, Mr. Sullivan appears to argue a violation of his due process rights under *Brady*, and newly-discovered evidence. We address the issues in turn.

### *Brady* violation claim

Mr. Sullivan appears to argue constitutional error in the form of a due process violation under *Brady*, contending that the State failed to produce evidence of the BOR work order before trial. As outlined above, to establish a *Brady* violation, a defendant must demonstrate three things: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material. *Davila*, 184 Wn.2d at 69.

In the case of the BOR work order, Mr. Sullivan and the State disagree whether the first element is demonstrated, although the State agrees that the work order is

41

"marginally relevant." Br. of Resp't at 48. We need not decide whether the first element is demonstrated, because the second and third are not.

For purposes of the second element, suppression, Mr. Sullivan takes it as a given that the State had constructive possession of evidence of the BOR work orders. "*Brady* obligations not only include evidence in the prosecutor's file but also include evidence in the possession of the police and others working on the State's behalf." *Mullen*, 171 Wn.2d at 895. "[T]he prosecution is in a unique position to obtain information known to other investigating agents of the government, it may not be excused from disclosing what it does not know, but could have learned." *Davila*, 183 Wn. App. 154, 169, 333 P.3d 459 (2014), *aff'd*, 184 Wn.2d 55, 357 P.3d 636 (2015). But while *Brady* obligations can extend to some individuals beyond prosecutors and police, "at some point the connection between the nondisclosure and the State becomes too remote for the underlying rationale of *Brady* to apply." *Mullen*, 171 Wn.2d at 901. The BOR was not engaged in investigative activity when it replaced or increased signage at the dam. Mr. Sullivan does not demonstrate that the federal BOR was acting as an agent of the Grant County prosecutor, a state official.

In addition, as previously discussed, if the means of obtaining the evidence is provided and with reasonable diligence the defendant could have obtained it, there is no suppression. *Id.* at 896. Mr. Sullivan was interested in the signage evidence before trial and it, like the BOR's video evidence, was a subject matter of his discovery motion heard

42

on March 31, 2015. The trial court indicated it would issue court orders for the discovery but a trial continuance would be necessary. Mr. Sullivan decided to forego the evidence.

For the third element, materiality, we have previously explained that a petitioner must show there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Davila*, 184 Wn.2d at 73. "The mere possibility that an item of undisclosed evidence might have helped the defense or might have affected the outcome of the trial . . . does not establish 'materiality' in the constitutional sense." *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 566, 397 P.3d 90 (2017) (internal quotation marks omitted) (quoting *State v. Kwan Fai Mak*, 105 Wn.2d 692, 704-05, 718 P.2d 407 (1986)). Mr. Sullivan does not demonstrate materiality. He was not charged with criminal trespass; only the fact that he *could* have been charged with the crime was relevant to the resisting arrest charge. Witnesses already disputed at trial which signage was in place at the time of Mr. Sullivan's arrest, so the evidence is cumulative. The new evidence demonstrates that signage on the shoreline was at least replaced or increased, but it does not prove that the signage described by state witnesses was not already in place. Even Mr. Sullivan's witnesses admitted that a sign reading, "No Trespassing on Road or Riverbank" was in place in the area where Mr. Sullivan parked his pickup and walked down to the riverbank. Finally, as the State argued in the trial below, even if Mr. Sullivan saw no signs, Officer Higgs

informed him that he was in a restricted area and gave him the opportunity to leave, which Mr. Sullivan refused to do.

Because Mr. Sullivan does not demonstrate constitutional error, we need not address whether he has demonstrated the actual and substantial prejudice required for collateral relief.

Claim of newly discovered evidence

Mr. Sullivan also appears to argue that the restraint is unlawful under RAP 16.4(c)(3), because "[m]aterial facts exist which have not been previously presented and heard, which in the interest of justice require vacation of the conviction[s]." The court reviews a claim of newly discovered evidence raised by a PRP under the same test as newly discovered evidence asserted in a new trial motion. *Fero*, 190 Wn.2d at 15.

To prevail on a claim of newly discovered evidence, a personal restraint petitioner must show evidence that (1) will probably change the result of the trial, (2) was discovered since the trial, (3) could not have been discovered before trial by the exercise of due diligence, (4) is material, and (5) is not merely cumulative or impeaching. *Id.* If any of these factors is missing, the petitioner is not entitled to relief. *Id.*

The work order arguably satisfies only the second element, and for reasons discussed above, it fails the first, fourth, and fifth elements. What signage was present on April 24, 2014, was already in dispute: the work order does not contradict the State's witnesses' testimony about what signage was in place but is only evidence that more or

44

different signs were in place after its completion. The presence on the day of the arrest of at least one sign reading "No Trespassing on Road or Riverbank" was not in dispute. Evidence of the signage testified to by state witnesses was not necessary to probable cause to arrest for criminal trespass, since Officer Higgs did not arrest Mr. Sullivan until after he had informed him he was trespassing and was met with intransigence.

Having demonstrated no basis for relief, the petition is dismissed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, J.

WE CONCUR:

Lawrence-Berrey, C.J.

Korsmo, J.